STATE OF CONNECTICUT *v.* CAROL TOMASKO
(15088)

Peters, C. J., and Berdon, Norcott, Katz and Palmer, Js.

Argued June 5—officially released July 23, 1996

*David J. Laudano*, with whom was *Raymond W. Ganim*, for the appellant (defendant).

*Frederick W. Fawcett*, assistant state's attorney, with whom, on the brief, were *Donald A. Browne*, state's attorney, and *Jonathan C. Benedict*, assistant state's attorney, for the appellee (state).

KATZ, J. Following a jury trial, the defendant, Carol Tomasko, was convicted of murder in violation of General Statutes § 53a-54a (a).[1] The defendant has appealed[2] from the judgment of the trial court sentencing her to fifty years imprisonment. On appeal, the defendant claims that: (1) the evidence was insufficient to prove beyond a reasonable doubt that she intended to kill the

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] The defendant appealed pursuant to General Statutes § 51-199, which provides in relevant part: "(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

victim; (2) the trial court improperly refused to instruct the jury on the lesser included offense of criminally negligent homicide in violation of General Statutes § 53a-58;[3] and (3) the trial court improperly overruled the defendant's objection to the introduction into evidence of two tape-recorded conversations between the state's chief witness and the defendant.[4] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On September 14, 1981, the defendant lived in Stratford with her husband, the victim, and her daughter, Suzette Meyer. The defendant and the victim shared a history of marital strife. On the night of the murder, the defendant and the victim were arguing because the victim had been arrested for driving an unregistered motor vehicle, and the victim had accused the defendant of having informed the police. In the course of the argument, the defendant threw a beer bottle at the victim, who had been drinking. Meyer, who was sitting at the kitchen table across from the victim, was looking down when she heard a loud noise. When Meyer looked up, she saw that the defendant was standing near the doorway holding a small handgun, and that the victim was slumped in his seat at the kitchen table. The victim died from a single gunshot wound to the back of the head.

Although Meyer did not actually see the defendant pull the trigger, she testified that the defendant had

---

[3] General Statutes § 53a-58 provides: "Criminally negligent homicide: Class A misdemeanor. (a) A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person, except where the defendant caused such death by a motor vehicle.

"(b) Criminally negligent homicide is a class A misdemeanor."

[1] On June 12, 1996, the defendant filed an amended appeal, pursuant to Practice Book § 4013 (a) (1), from the trial court's decision, dated May 31, 1996, denying the defendant's motion for a new trial dated November 21, 1995. Because the pleadings relating to the amended appeal have not been received, we do not consider the amended appeal as part of this appeal.

been moving around during the course of the argument and, at one point, had entered Meyer's bedroom. Meyer and the victim's son both testified that the defendant customarily carried the handgun in her pocketbook, which she normally kept in Meyer's bedroom.

After the shooting, the defendant held the gun to Meyer's head and told her to help clean up the blood from the floor. While Meyer was cleaning the floor, the defendant dragged the victim's body out the back door and into the yard. Meyer then assisted the defendant in lifting the victim's body into a pickup truck. Thereafter, the defendant, with Meyer as a passenger, began driving the pickup truck through Stratford. Because the truck developed mechanical problems, the defendant drove the truck to the house of her brother, Ellsworth Hull, where the engine stopped running. Hull, who never noticed the victim's body in the bed of the truck, was unable to jump start the vehicle. Hull then drove Meyer and the defendant home. Meyer never saw the victim's body again. One week later, Meyer learned that the victim's body had been found floating in Long Island Sound.

Because Meyer feared for her life as a result of the defendant's threats, she did not tell the police about the incident until 1992. On September 2, 1992, after reading an article in the local newspaper about the unsolved murder, Meyer told Hull, in whose home she was then living, about the murder. Meyer contacted the police that same day and implicated the defendant. After an investigation in which Meyer assisted the police, the defendant was arrested and charged in a one count information with murder. Additional facts will be presented as needed.

Practice Book § 4006. Therefore, our review is limited to the issues raised in the defendant's original appeal.

I

The defendant's first claim is that the trial court improperly denied her motion for judgment of acquittal because the evidence was insufficient to prove beyond a reasonable doubt that she had had the specific intent to cause the death of the victim. We disagree.

"In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993). The specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11). . . . *State* v. *Raguseo*, 225 Conn. 114, 120, 622 A.2d 519 (1993). Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. *State* v. *Greenfield*, supra, 77. Therefore, intent is often inferred from conduct; id., 76; and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. *State* v. *Raguseo*, supra, 119." (Internal quotation marks omitted.) *State* v. *Mejia*, 233 Conn. 215, 223, 658 A.2d 571 (1995). "Furthermore, [i]ntent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . *State* v. *Raguseo*, supra, 120." (Internal quotation marks omitted.) *State* v. *Mejia*, supra, 224. "This does not require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt

because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. *State* v. *Crafts*, 226 Conn. 237, 244, 627 A.2d 877 (1993). Nevertheless, because intent to cause the death of a person is an element of the crime; *State* v. *Raguseo*, supra, 120; that intent must be proven beyond a reasonable doubt. *Patterson* v. *New York*, 432 U.S. 197, 204, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)." (Internal quotation marks omitted.) *State* v. *Mejia*, supra, 223–24.

"We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . *State* v. *Henning*, 220 Conn. 417, 420, 599 A.2d 1065 (1991). This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . *State* v. *Hart*, 198 Conn. 424, 427, 503 A.2d 588 (1986)." (Internal quotation marks omitted.) *State* v. *Mejia*, supra, 233 Conn. 224.

The evidence presented at the defendant's trial was sufficient to support the jury's finding beyond a reasonable doubt that she had intended to kill the victim. Meyer testified that the defendant and the victim had had a history of marital conflicts. On the night of the shooting, the victim had accused the defendant of telling the police that he had been operating an unregistered vehicle. An argument ensued and the defendant threw a beer bottle at the victim. Although Meyer did not see the defendant leave the kitchen, she did testify that the defendant customarily carried her gun in her pocketbook, which she normally left in Meyer's bedroom. Therefore, the jury could have inferred that the defendant had left the kitchen to retrieve her gun before

shooting the victim in the back of the head. We conclude, moreover, that this evidence was sufficient for the jury also to infer that the defendant possessed an intent to kill, stemming from the permissible inference that the defendant had left the room to retrieve her gun and then returned to shoot the victim. "We have stated that [o]ne who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill. . . . *State* v. *Holley*, 174 Conn. 22, 26, 381 A.2d 539 (1977)." (Internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 680, 613 A.2d 788 (1992).

Likewise, the jury was free to infer an intent to kill from the defendant's failure to assist the victim after the shooting. We have previously noted that "the defendant's failure to summon medical assistance for [her] victim [is] part of the evidence from which the jury could have inferred an intent to kill." *State* v. *Sivri*, 231 Conn. 115, 129, 646 A.2d 169 (1994). Instead of seeking medical assistance for the victim, the defendant threatened Meyer not to tell anyone about the incident and immediately began the process of hiding the body. Consequently, there was sufficient evidence to support the jury's finding that the defendant, when she shot the victim, had the requisite intent to kill him.

## II

The defendant next claims that the trial court improperly denied her request to charge the jury on criminally negligent homicide as a lesser included offense of murder. In addition to charging murder, the trial court gave jury instructions on manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3)[5] and

[5] General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in

manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1).[6] The trial court, however, concluded that the defendant was not entitled to a jury instruction on criminally negligent homicide because there was no evidence justifying conviction of the lesser offense. The state argues that the defendant failed to request an appropriate instruction.[7] We agree with the state.

"There is no fundamental constitutional right to a jury instruction on every lesser included offense"; *State v. Whistnant*, 179 Conn. 576, 583, 427 A.2d 414 (1980); rather, the right to such an instruction is purely a matter of our common law. "A defendant is entitled to an instruction on a lesser [included] offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." Id., 588.

"In considering whether the defendant has satisfied the requirements set forth in *State v. Whistnant*, supra,

---

conduct which creates a grave risk of death to another person, and thereby causes the death of another person. . . ."

[6] General Statutes § 53a-56 provides in relevant part: "(a) A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

[7] The state also argues that the defendant has failed to meet the third and fourth prongs of *State v. Whistnant*, 179 Conn. 576, 588, 427 A.2d 414 (1980). Because we conclude that the defendant failed to request an appropriate instruction, we need not address the state's additional arguments.

179 Conn. 588, we view the evidence in the light most favorable to the defendant's request for a charge on the lesser included offense. *State* v. *Montanez*, 219 Conn. 16, 22–23, 592 A.2d 149 (1991); *State* v. *Herring*, 210 Conn. 78, 106, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989). '[T]he jury's role as fact-finder is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a lesser included offense, if it is requested. . . . Otherwise the defendant would lose the right to have the jury pass upon every factual issue fairly presented by the evidence.' . . . *State* v. *Rasmussen*, 225 Conn. 55, 68, 621 A.2d 728 (1993). On appeal, an appellate court must reverse a trial court's failure to give the requested instruction if 'we cannot as a matter of law exclude [the] possibility' that the defendant is guilty only of the lesser offense. *State* v. *Falby*, 187 Conn. 6, 30, 444 A.2d 213 (1982)." *State* v. *Arena*, 235 Conn. 67, 73–74, 663 A.2d 972 (1995).

Under the first prong of *State* v. *Whistnant*, supra, 179 Conn. 588, we must determine whether the request to charge constituted an appropriate instruction. "A proposed instruction on a lesser included offense constitutes an appropriate instruction for purposes of the first prong of *Whistnant* if it complies with Practice Book § 854. *State* v. *Hall*, 213 Conn. 579, 591, 569 A.2d 534 (1990); *State* v. *Ostroski*, [201 Conn. 534, 556–58, 518 A.2d 915 (1986)]; *State* v. *McIntosh*, [199 Conn. 155, 158–61, 506 A.2d 104 (1986)]. Section 854 provides in relevant part: 'When there are several requests, they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based, *and the evidence to which the proposition would apply* . . . .' " (Emphasis added.) *State* v. *Arena*, supra, 235 Conn. 75. "We have held that, in the context of a written request to charge on a lesser

included offense, this requirement of § 854 is met only if the proposed request contains such a complete statement of the essential facts as would have justified the court in charging in the form requested." (Internal quotation marks omitted.) *State* v. *Hall*, 213 Conn. 579, 591, 569 A.2d 534 (1990).

" 'While this court does not favor unyielding adherence to rules of procedure where the interests of justice are thereby disserved . . . the ever increasing refinement of our law justifies cooperation of counsel in stating requests for jury instruction. The minor burden of cooperation imposed by [Practice Book § 854] is neither unreasonable nor novel.' . . . *State* v. *Hall*, supra, 213 Conn. 593." *State* v. *Arena*, supra, 235 Conn. 75–76.

General Statutes § 53a-58 provides in pertinent part: "A person is guilty of criminally negligent homicide when, *with criminal negligence*, he causes the death of another person." (Emphasis added.) "A person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists." General Statutes § 53a-3 (14). Accordingly, to comply with the first prong of *State* v. *Whistnant*, supra, 179 Conn. 588, and Practice Book § 854, the defendant's request to charge must enumerate the essential facts to justify the court's instruction to the jury pertaining to the defendant's failure to "perceive a substantial and unjustifiable risk" of the victim's death.

We conclude that the defendant's request to charge did not set forth the essential facts to warrant the court's instruction on criminally negligent homicide. The defendant's request included the following facts: "You heard testimony that the victim was shot. However, the State's witness Suzette Meyer testified that she did not actually see the defendant pull the trigger. She testified

that she was seated with her head down when the shot was fired. Suzette Meyer did not testify as to what caused the gun to be fired." The request does not enumerate any essential facts demonstrating the defendant's failure to "perceive a substantial and unjustifiable risk" of the victim's death. We find unpersuasive the fact that Meyer did not actually see the defendant pull the trigger because that circumstance "is as applicable to the offenses of murder, manslaughter in the first degree, and manslaughter in the second degree as to criminally negligent homicide."[8] *State* v. *Hall*, supra, 213 Conn. 592. In our view, the defendant's written request to charge constitutes "[a] mere general statement of the entire incident at issue [which] does not comply with our rules of practice." Id., 591–92. Accordingly, the trial court did not improperly refuse the defendant's request to instruct the jury on the offense of criminally negligent homicide.

### III

The defendant's final claim is that the trial court improperly admitted into evidence two tape-recorded conversations between the defendant and Meyer. We disagree.

The following additional facts are relevant to this issue. In September, 1992, after reading a newspaper article about the unsolved death of the victim, Meyer approached the local police and gave a statement implicating the defendant. In exchange for immunity, Meyer

---

[8] We are also unpersuaded by the defendant's contention at oral argument that the trial court improperly failed to provide the requested jury charge because the jury could have found that the defendant, in self-defense or in a state of emotional distress, shot the victim in the course of a heated domestic altercation. We note that this argument, which is totally inconsistent with the defendant's trial testimony in which she denied shooting the victim, was not specified in the requested jury charge and, consequently, could not constitute the essential facts required to satisfy the first prong of *State* v. *Whistnant*, supra, 179 Conn. 588.

agreed with the state's attorney's office to wear a recording device and to attempt to elicit an admission of guilt from the defendant.

On September 11, 1992, Meyer and the defendant met at a local supermarket. The police had informed Meyer that the defendant would be at the supermarket at the designated time. Meyer, who was wearing a microphone in her baseball hat, met with the defendant and attempted to obtain an admission.[9]

---

[9] The transcript of the September 11, 1992 meeting provides in relevant part:

"[Meyer]: I gotta stay at home. There's an article in the paper.

"[The Defendant]: About what? About George?

"[Meyer]: Yes.

"[The Defendant]: What does that have to do with staying home?

"[Meyer]: I don't know. I'm getting real nervous about it.

"[The Defendant]: Why?

"[Meyer]: After all this time, what the hell's going on.

"[The Defendant]: They do that once a week. All unsolved crimes.

"[Meyer]: Yeah. I know they're going to make it into Unsolved Mysteries thing and they open it back up again.

"[The Defendant]: This is the second time they've done it.

"[Meyer]: I don't go for it. Makes me very nervous.

"[The Defendant]: I don't think there's anything to be nervous about. They don't have any—any evidence that they didn't have before.

"[Meyer]: Well, even though I got my shit together now, I don't wanna—I'm not going down for something like that. Even if they opened it, they come back for more information or something.

"[The Defendant]: It's only because it's one of these unsolved crimes that they did put it in the paper.

"[Meyer]: They don't contact you?

"[The Defendant]: Yeah.

"[Meyer]: Oh, they did?

"[The Defendant]: Oh, yeah. I told 'em I had no comment. That's why only, the only thing that was in the paper was George's family. And they didn't want to talk to 'em either. No, they said it was too much pain or aggravation or something. They don't want to talk to 'em.

"[Meyer]: They better not come after me. I'm nervous.

"[The Defendant]: Well, what good's that going to do you?

"[Meyer]: I don't know. What if they want you to take a lie detector or something after all this time?

"[The Defendant]: Just—Just deny it. You just say, 'No, I won't. I don't have anything to do with it and you can't bother me.'

"[Meyer]: What if they make you though?

On September 15, 1992, the police tape-recorded a telephone conversation between Meyer and the defendant. Meyer telephoned the defendant from a police car, accompanied by police officers, and asked the defendant to call her back at a pay telephone. The telephone number that Meyer gave the defendant was actually that of the telephone she was then using in the police car. When the defendant returned Meyer's telephone call, Meyer again attempted to elicit an admission.[10]

"[The Defendant]: They can't make you. They have to have some kind of evidence against you to get a warrant for you. And they have none. So, they can't do it. Do you want a free trip to my lawyer's office?

"[Meyer]: No.

"[The Defendant]: Go down and talk to them about—

"[Meyer]: I'm just concerned. I don't wanna go down for something that I consider out of my past. And now it's back up again and I'm looking over my shoulder, and I don't—I don't like it. I don't like it. (inaudible)

"[The Defendant]: You're making yourself too nervous. Don't be scared 'cause nothing's gonna happen. . . ."

[10] The transcript of the September 15, 1992 telephone conversation provides in relevant part:

"[Meyer]: Hello.

"[The Defendant]: Hello. What's going on?

"[Meyer]: They called me. They want to talk to me. I put 'em off till three o'clock. They're going to come to the house.

"[The Defendant]: Who called you?

"[Meyer]: The police.

"[The Defendant]: What's—What police?

"[Meyer]: I don't know. They—they didn't say. Did they call you?

"[The Defendant]: No.

"[Meyer]: What the fuck's going on?

"[The Defendant]: I don't know, but there is no—there is no evidence.

"[Meyer]: There's—there's got to be. Because I—

"[The Defendant]: You know, the only thing there is is you telling Robin Wade all these stories and—and—unless somebody said something. There is no evidence. There never was evidence. Never, ever. There was no evidence.

"[Meyer]: There's got to be something or they're—I don't [know] why they're contacting me. They're not contacting you. They're contacting—

"[The Defendant]: Well, they—

"[Meyer]: —me. Why?

"[The Defendant]: —they contacted George's family and asked him what they had to say, you know, last time what they had to say. I mean—ah—Grandpa and Steve and Auntie May—

"[Meyer]: Yeah.

At trial, the state offered the cassette tapes and transcripts of the conversations into evidence. The defendant objected, arguing that because Meyer was acting as an agent of the state, *Miranda* warnings were required. The trial court overruled the defendant's objection, determining that there had been no custodial interrogation.[11]

The defendant argues that: (1) both recordings were improperly admitted because they were the product

"[The Defendant]: —and they said they didn't have anything to say.

"[Meyer]: Well—

"[The Defendant]: There isn't anything to say.

"[Meyer]: Look, I don't remember that far back, what I said, what I didn't say. They're going to question me. I don't know what to say. What'll—

"[The Defendant]: Say, 'I don't remember.'

"[Meyer]: Oh—

"[The Defendant]: How about—

"[Meyer]: And if they give me a lie detector test?

"[The Defendant]: Bullshit. You have to say 'No' to that. You know, zero.

"[Meyer]: But I'm—I'm not going to jail for something you did. I am scared shitless. You know, I don't know what to say.

"[The Defendant]: Well, you're telling me that you're not going to jail. There's no reason for you to go to jail.

"[Meyer]: Hey, look! I'm just as guilty as you are.

"[The Defendant]: Right. So, if you just shut up, there isn't anything else—

"[Meyer]: Yeah, what if—what if they've got something?

"[The Defendant]: They have nothing. . . ."

[11] In overruling the defendant's objection, the trial judge stated: "You're actually touching on a number of interesting doctrine here—question of agency; whether she is an agent of the state, which is arguable in this case.

"There are a number of elements that the courts require in order to get to the agency question. The most significant one is compensation. And that appears to be lacking in this case. Also, whether they actually placed her, such as putting someone into a cell. Apparently she took care of this part of it herself, and whether they get the fruits of the—the adventure, which I'm sure they did in this case.

"That leaves that as an arguable situation.

"But the more critical one is the fact that the constitution requires a custodial interrogation. This was not a custodial interrogation, which brings up the question of should it have been? Which really impinges on the question of preaccusational delay which is a fifth amendment problem, really due process. And this case does not come anywhere close to the preaccusational delay cases that I've seen.

of custodial interrogation and, consequently, *Miranda* warnings had been required; and (2) the recorded telephone conversation was improperly admitted because it constituted an intercepted wire communication in violation of General Statutes § 54-41*l*.[12] We disagree with each of these claims.

A

The defendant argues that, because the tape-recorded conversations occurred in a "police dominated environment," *Miranda* warnings were required. We disagree.

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. *Miranda* v. *Arizona*, [384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]. . . . *State* v. *Williams*, 227 Conn. 101, 112, 629 A.2d 402 (1993); accord *State* v. *DesLaurier*, 230 Conn. 572, 576, 646 A.2d 108 (1994). As stated by the United States Supreme Court in *California* v. *Beheler*, [463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)], [a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for

"This was a one-on-one situation, basically daughter against mother. And seems to me that it would be fatuous to say that the state should not go out and try to get some corroboration for a one-on-one situation.

"I just don't think that this is anywhere near the required threshold for a preaccusational situation.

"What you're really saying is that she had a right to be arrested. And I don't think that that follows from the set of facts.

"I'm going to deny your motion for all of those reasons."

[12] General Statutes § 54-41*l* provides: "Intercepted communication admissible as evidence, when. The contents of any intercepted wire communication or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing or other proceeding in a court of this state unless each aggrieved person, not less than thirty days before such trial, hearing or proceeding, has been served with a copy of the court order, and accompanying application, under which the interception was authorized."

purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. [*Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 711 (1977)]. See also *New York* v. *Quarles*, 467 U.S. 649, 655, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984); *Minnesota* v. *Murphy*, 465 U.S. 420, 430–31, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984); *United States* v. *Cadmus*, 614 F. Sup. 367, 370 (S.D.N.Y. 1985). *State* v. *Pittman*, 209 Conn. 596, 608, 553 A.2d 155 (1989); accord *State* v. *Ross*, 230 Conn. 183, 204, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); see also *Thompson* v. *Keohane*, [516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)]. Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, *the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest. . . . State* v. *DesLaurier*, supra, 577.

"Furthermore, we note that [n]o definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody. Because, however, the *Miranda* court expressed concern with protecting defendants against interrogations that take place in a 'police-dominated atmosphere' containing inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely; *Miranda* v. *Arizona*, supra, 384 U.S. [467]; circumstances relating to those kinds of concerns are highly relevant on the custody issue. See generally C. Whitebread & C. Slobogin, Criminal Procedure (3d Ed. 1993) § 16.03, pp.

385–91; 1 W. LaFave & J. Israel, Criminal Procedure (1984) § 6.6, pp. 494–99. *State* v. *DesLaurier,* supra, 230 Conn. 577–78.

"The defendant bears the burden of proving custodial interrogation. *State* v. *Pittman,* supra, 209 Conn. 606. The trial court's determination of the historical circumstances surrounding the defendant's interrogation are findings of fact; id.; which will not be overturned unless they are clearly erroneous. *State* v. *Young,* 191 Conn. 636, 652, 469 A.2d 1189 (1983); *State* v. *Ostroski,* 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); see Practice Book § 4061. In order to determine the ultimate issue of custody, however, we will conduct a scrupulous examination of the record; *State* v. *Weidenhof,* 205 Conn. 262, 267–68, 533 A.2d 545 (1987); in order to ascertain whether, in light of the totality of circumstances, the trial court's finding is supported by substantial evidence. *State* v. *Pittman,* supra, 606; *State* v. *Toste,* 198 Conn. 573, 580, 504 A.2d 1036 (1986); *State* v. *Alexander,* 197 Conn. 180, 185, 496 A.2d 486 (1985)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Atkinson,* 235 Conn. 748, 757–59, 670 A.2d 276 (1996).

Applying these principles to the facts of this case, we conclude that there is substantial evidence in the record to support the trial court's conclusion that the defendant failed to prove that she was in custody during the course of either the September 11, 1992 meeting or the September 15, 1992 telephone conversation. At all times during the meeting in the supermarket, the defendant was free to leave. Meyer neither used, nor threatened to use, force to detain the defendant. Further, during the September 15, 1992 telephone conversation, the defendant was not obligated to return Meyer's telephone call. Indeed, the defendant could have terminated the conversation at any time by simply hanging

up the receiver. Accordingly, because a review of the facts in the record reveals that a reasonable person in the defendant's position would not have believed that she was in custody, during either the supermarket meeting or the telephone conversation, we agree with the trial court's conclusion that the defendant was not entitled to *Miranda* warnings.

## B

The defendant next claims that the trial court improperly admitted into evidence the tape-recorded September 15, 1992 telephone conversation in violation of § 54-41*l*.[13] See footnote 12. In particular, the defendant argues that, because she was not served with a copy of the court order authorizing the intercepted wire communication, a new trial is warranted.[14] We disagree.

"In general terms, our wiretap act [General Statutes § 54-41a et seq.] provides that, based upon certain specified findings, a panel of three Superior Court judges may issue an order authorizing 'the interception of wire communications within the state of Connecticut. . . .'

---

[13] Contrary to the state's argument that the defendant has not preserved this issue for appeal, we find that it was sufficiently raised at trial to warrant review.

[14] The defendant also argues that the admission of the recorded telephone conversation deprived her of her constitutional right to a fair trial. Under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) We are free to dispose of the claim "by focusing on whichever condition is most relevant in the particular circumstances." Id., 240. In this case, we conclude that the defendant has failed to satisfy the third condition of *Golding* because she has not provided any meaningful analysis establishing how the admission of the telephone conversation "clearly deprived" her of her right to a fair trial.

General Statutes § 54-41d. For these purposes, ' "[i]ntercept" means the intentional overhearing or recording of a wire communication through the use of any electronic, mechanical or other device.' General Statutes § 54-41a (2)."[15] *State* v. *McVeigh*, 224 Conn. 593, 604–605,

[15] General Statutes § 54-41a provides: "Definitions. The following words and phrases, as used in this chapter, shall have the following meanings, unless the context otherwise requires:

"(1) 'Wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of telephone or telegraph between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of intrastate, interstate or foreign communications;

"(2) 'Intercept' means the intentional overhearing or recording of a wire communication through the use of any electronic, mechanical or other device;

"(3) 'Electronic, mechanical or other device' means any device or apparatus which can be used to intercept a wire communication other than (A) any telephone or telegraph instrument, equipment or facility, or any component thereof (i) furnished to the subscriber or used by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business, or (ii) being used by a communications common carrier in the ordinary course of its business, (B) a hearing aid or similar device being used to correct subnormal hearing to not better than normal;

"(4) 'Person' means any officer, agent or employee of the state of Connecticut or any political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation;

"(5) 'Investigative officer' means (A) any officer of the Connecticut state police, (B) the chief inspector or any inspector in the division of criminal justice who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, (C) any municipal police officer who has been duly sworn as a special state police officer under the provisions of section 29-177 and who is currently assigned to the state-wide narcotics task force or the state-wide organized crime investigative task force and is acting under the direct authority of the Connecticut state police, and (D) any attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in this chapter;

"(6) 'Law enforcement officer' means any officer of any organized police department of this state or of the state police of any other state, an official of the Federal Bureau of Investigation, Drug Enforcement Administration or United States Customs Service, or the United States attorney for the district of Connecticut or a person designated by him in writing to receive the contents of any wire communication or evidence derived therefrom;

620 A.2d 133 (1993). Section 54-41*l* prohibits the contents of intercepted wire communications from being admitted into evidence unless the "aggrieved person" has been served with a copy of the court order at least thirty days before trial.

We have held, however, that the protections of the wiretap act are inapplicable to wiretaps in which one party consents to the recording. *State* v. *Grullon*, 212 Conn. 195, 211, 562 A.2d 481 (1989). In *Grullon*, we emphasized that " '[t]he competing interests of the community in effective law enforcement and of the individual in his privacy are, in a unique way, drawn into question by police wiretapping. Clearly, our statutes are aimed at balancing these competing interests.' " Id., 210–11, quoting *State* v. *Ross*, 194 Conn. 447, 458, 481 A.2d 730 (1984). Accordingly, if one of the parties to a telephone conversation consents to wiretapping, the provisions of the wiretap act, including § 54-41*l*, do not apply.

In this case, it is undisputed that Meyer consented to the wiretapping of the September 15, 1992 telephone conversation with the defendant. We conclude that,

"(7) 'Contents', when used with respect to any wire communication, means and includes any information concerning the identity of the parties to such communication or the existence, substance, purport or meaning of that communication;

"(8) 'Panel of judges' or 'panel' means any panel or panels of three superior court judges specifically designated by the chief justice of the supreme court from time to time to receive applications for, and to enter orders authorizing, interceptions of wire communications in accordance with the provisions of this chapter;

"(9) 'Communication common carrier' means any person engaged as a common carrier for hire in the transmission of communications by wire or radio;

"(10) 'Aggrieved person' means a person who was a party to any intercepted wire communication, a person against whom the interception was directed, a person named in any order authorizing an interception, or a person having a property interest in any premises involved in any interception."

because the wiretap act does not apply to consensual wiretaps, the state was under no statutory obligation to obtain a court order authorizing the wiretap or to give the defendant a copy of that order and the accompanying application.

The judgment is affirmed.

In this opinion PETERS, C. J., and NORCOTT and PALMER, Js., concurred.

BERDON, J. I concur in the result.