STATE OF CONNECTICUT *v.* GREGORY MCCLAM
(15604)

Heiman, Spear and Freedman, Js.

Argued November 7, 1996—officially released February 4, 1997

*Suzanne Zitzer*, assistant public defender, for the appellant (defendant).

*Rita M. Shair*, assistant state's attorney, with whom were *Michael Dearington*, state's attorney, and, on the brief, *David P. Gold*, assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant, Gregory McClam, appeals[1] from the judgment of conviction, rendered after a trial to a three judge panel,[2] of one count of murder in violation of General Statutes § 53a-54a.[3] On appeal, the defendant claims that the trial court improperly (1) induced a state's witness to invoke his fifth

---

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

[2] On June 27, 1994, the defendant waived his right to a jury trial, and requested a trial to a three judge panel.

[3] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

amendment privilege against self-incrimination regarding any questions about a pending related assault charge, (2) denied his motion for a judgment of acquittal on the charge of murder when the evidence at trial was insufficient to establish beyond a reasonable doubt that the defendant possessed the requisite intent to commit the crime of murder, and (3) determined that there was sufficient evidence at the probable cause hearing to find probable cause that the defendant possessed the requisite intent for the crime of murder. We affirm the judgment of the trial court.

The record and transcripts of the proceedings before the trial court reveal the following facts. At approximately 11 p.m. on March 14, 1992, Dwight Binns, Damon Williams, his brother David Williams, Brian McCoy, Warren Murphy and his girlfriend were all at Tipton's nightclub in Stamford. At the nightclub, McCoy asked Murphy's girlfriend to dance. A fistfight ensued between McCoy's friends and Murphy's friends. The fight was stopped by club security, but started again. Eventually, the nightclub was closed and everyone was asked to leave.

When Murphy returned to his car in the nightclub parking lot, he found the windows broken, the back door bent and a coat missing from the backseat. Murphy assumed that the damage had been inflicted by McCoy and his friends.

Murphy drove to his house in North Haven and called Alan Walker. Walker, accompanied by the defendant and Jimmy Dennis, drove to Murphy's house and observed the damage to Murphy's car. Murphy, Walker, the defendant and Dennis all got into Walker's Honda Accord and drove toward West Haven in an effort to find McCoy and his friends and to finish the fight.

McCoy, the Williams brothers, Binns and George Ortiz were in front of David Williams' home in West Haven when Murphy and his friends drove by in Walker's Honda Accord. The two groups stared at each other, but no words were exchanged.

McCoy and his friends got into David Williams' Hyundai Excel. Binns was driving, McCoy was in the passenger seat and Ortiz, Damon and David Williams were in the backseat. Binns drove to a convenience store and gas station. Murphy and his friends were there buying gas. The defendant got out of the Honda and overheard someone in the Hyundai refer to getting a gun ready. The defendant relayed what he had heard to the occupants of the Honda. The defendant and his friends left the gas station in the Honda and drove toward New Haven. The men in the Hyundai exited the gas station a few seconds later and followed the Honda. As the Hyundai passed the Honda on the left, one of the men in the backseat of the Hyundai pointed a rifle out of the right backseat window toward the Honda. When the Hyundai was two or three car lengths in front of the Honda, the defendant rolled down the front passenger seat window, stuck a nine millimeter gun out of it and fired at least ten bullets at the back of the Hyundai.

David Williams, who was sitting in the backseat of the Hyundai, was shot in the back. Binns drove directly to the hospital, where the victim was pronounced dead.

After the shooting, Murphy and his friends in the Honda drove directly to Walker's girlfriend's apartment. From there, they all went home.

At trial, Detective Bennie Smith of the New Haven police department testified that on March 15, 1992, at 4:28 a.m., he found eleven empty shell casings in the vicinity of the shooting. He further testified that ten of

the casings were from a nine millimeter gun, and one casing was from a .38 caliber gun. Ira Kanfer, the pathologist who performed the autopsy on the victim, also testified at trial. Kanfer testified that the victim died from a gunshot wound. He explained that the bullet entered the victim's body through his back and traveled through his right lung into one of the larger vessels in the heart region, causing the victim to bleed to death.

On December 2, 1994, a three judge panel found the defendant guilty of murder. On February 9, 1995, the trial court sentenced the defendant to the custody of the commissioner of correction for a term of thirty-five years. This appeal follows.

I

The defendant first claims that the trial court violated his constitutional right of confrontation by improperly inducing a state's witness to invoke his fifth amendment privilege against self-incrimination regarding any questions about a pending related assault charge. We disagree.

The defendant raises this issue for the first time on appeal[4] and thus seeks review of this claim under the doctrine of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Because the record is adequate for review and the claim advanced implicates a fundamental constitutional right, the defendant has satisfied the first two prongs of *Golding*, and is entitled to review of his unpreserved claim.[5]

---

[4] The defendant argues in his reply brief that he adequately preserved this claim. After a review of the relevant trial court transcript, however, we conclude that the defendant did not adequately preserve this claim. See footnote 5.

[5] The first two conditions [of *Golding*] are determinations of whether a defendant's claim will be reviewed, and the third condition involves a review of the claim itself." *State* v. *Graham*, 33 Conn. App. 432, 442, 636 A.2d 852, cert. denied, 229 Conn. 906, 640 A.2d 117 (1994).

Certain additional facts are necessary for an understanding of this issue. During the direct examinationof Damon Williams, there was an extended colloquy among the court, the defense counsel and the prosecuting attorney, outside the presence of the witness.[6] The

[6] The colloquy among counsel and the court was in pertinent part as follows:

"[State's Attorney]: There is a matter we wanted to take up in the witness' absence. He's out in the hall. The witness Williams has a pending assault one case here being prosecuted in this courthouse in which the allegations are that in November, 1993—so about eighteen months after the incident . . . Mr. Williams shot Warren Murphy who you are going to be hearing from as well. Mr. Murphy has recovered, but the charge is assault in the first degree. . . . I've set forth the nature of the allegations which, to some extent, connect the two cases, but I can't in good conscience mention to Mr. Williams or his family that he should, nor do I see any reason why he should have to make any admissions under oath, and I would have to tell him to take the fifth. . . .

"The Court: That would properly entitle you to question about whether the fact that there is this pending case has affected his testimony here and any belief or leaning to or promises or agreement having to do with his testimony. That's one thing. But that doesn't get into any questions about the facts of the pending case. You intend to get to that . . . ? And if so . . . we obviously run into a problem, fifth amendment problem.

"[Defense Counsel]: Yes, we do run into a fifth amendment problem. That's why I raised this question to [the state's attorney] before directly asking the question of the witness and with regard to putting this before the court. I don't want to be put in a position that I'm asking somebody questions which I know he's going to take the fifth amendment, but on the other hand . . . .

"The Court: Well, in view of the fact that there is no jury here, it is not of the greatest consequence that he invokes his fifth amendment privilege, and I expect that he will do that. As a matter of fact, if he indicates he's not going to do that, I wouldn't let it go ahead without having his lawyer here. Now, that's what is going to happen. Then what are you going to do?

"[Defense Counsel]: The important point from my point of view is not so much what he says in a sense, but what the allegation is as to the particulars in that case. It was clearly obviously connected with this case and I think it raises an issue of the witness' motive for testifying as he does, whatever he says in connection with the case, because it's clear, I think, the evidence has shown that my client was in a car, the same car that Mr. Murphy was in on the same day that the witness' brother became the victim of a killing, so I think it raises the question of this witness' motive for testifying against my client because this other matter involves someone who may have been associated with my client at the time the witness' brother was shot.

prosecuting attorney brought to the court's attention that Damon Williams had a pending related assault charge. Approximately eighteen months after the murder, Damon Williams, the brother of the victim, was charged with shooting Warren Murphy. Damon Wil-

"The Court: Well, I don't know that [the state's attorney] particularly disagrees with you.

"[State's Attorney]: The allegations I'm going to bring out through the witness, and the court can consider it for whatever it is worth, I'm just trying to prevent a situation where the witness is caught unaware, so to speak, and is asked questions about a pending case. I think that's my duty here. I don't see why his answers are relevant. [Defense counsel] agrees; I don't see a problem.

"[Defense Counsel]: I didn't intend to ask him to admit the facts of this particular case except in so far as I would ask him if he's guilty of the crime of assault, which is a felony. Had he admitted it, that would affect his credibility as a witness.

"The Court: You are not going to ask him any questions that could arguably relate to the pending charge against him which he has pleaded not guilty to.

"[Defense Counsel]: Correct.

"The Court: And he has a fifth amendment privilege not to answer those questions. I can understand, and I think [the state's attorney] can understand, that assuming for the moment that the witness did shoot Mr. Murphy, then, Mr. Murphy is involved with the other group that is involved with your client, that might have some bearing on his motivation here to testify adversely to your client, which, of course, I have not heard him do it yet, that he got one of the other group, now he's going to get the other one, so to speak. That's all well and good, but the trouble is he has a fifth amendment privilege not to get into the details of the charge against him. We might as well get started here, ask what you want to ask and we'll rule as we see fit . . . .

"[Defense Counsel]: One last thing . . . I will ask the witness if he is guilty of this crime of assault in the first degree with respect to one Warren Murphy. If Your Honor then tells him he has certain rights and so forth, I'm not going to then press the issue, but just for purposes of his testimony, that's how I would be asking him.

"[State's Attorney]: I think then the court can rule right now on the appropriateness of the question. I don't think the witness should be forced to wait for the court's ruling. That can be, can be posed now and the court has indicated its intention that he will tell the witness not to answer. Again, he's going to take the fifth amendment to that question.

"[Defense Counsel]: If [the state's attorney] is going to stipulate that that's what he's going to answer to, that question, then I just want to say that I intend to raise it.

"The Court: Why don't we just bring the witness in and I'm going to instruct him not to answer any—I will ask him if he wishes to assert his fifth amendment privilege not to answer any questions regarding the pending charge against him. If he says yes he does intend to assert his fifth amendment privilege, that then brings an end to that question."

liams pleaded not guilty to a charge of first degree assault. The court and both counsel agreed that the witness would have a right to invoke his fifth amendment privilege against self-incrimination if asked any questions regarding the facts of the pending assault case.

When Damon Williams returned to the witness stand, the court asked him whether there was a pending first degree assault case in which he was charged with shooting Warren Murphy and whether it was correct that he had pleaded not guilty to that charge. The witness indicated that the court was correct. Next, the court informed the witness that he had a fifth amendment privilege not to answer any questions relating to that pending case and asked the witness if he wanted to assert his fifth amendment privilege. The witness indicated that he did. The prosecuting attorney then asked the witness a series of questions regarding whether he had agreed to testify in this case in exchange for a promise that he would receive a lesser sentence in the pending assault case. The witness indicated that no such agreement had been made.

There is nothing in the record to support the defendant's claim that the prosecutor and the trial court "improperly induced the witness into silence." Moreover, during the colloquy among the court and counsel, the trial court determined that any questions as to the facts of the pending case or whether the defendant was guilty of the assault would potentially incriminate the witness. Further, the trial court permitted counsel to question the witness as to whether the pending assault charge in any way affected or motivated the witness' testimony here. Thus, the record does not substantiate the defendant's claim that the trial court "improperly gave the witness a blanket right to assert the fifth amendment privilege to all questions relating to the pending assault, without making the required determi-

nation that the information sought by the questions truly subjected the witness to incrimination." We conclude that the trial court did not violate the defendant's constitutional right of confrontation, and thus the defendant has failed to satisfy the third prong of *Golding*.[7]

## II

Next, the defendant asserts that the trial court improperly denied his motion for a judgment of acquittal on the charge of murder when the evidence at trial was insufficient to establish beyond a reasonable doubt that the defendant possessed the requisite intent to commit the crime of murder. We disagree.

"When called on to review a challenge to the sufficiency of the evidence to support a conviction, we undertake a two part analysis . . . . First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Cintron*, 39 Conn. App. 110, 118, 665 A.2d 95 (1995).

"The specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11). . . . Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences

---

[7] The third prong of *Golding* is an inquiry into whether "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." *State* v. *Golding*, supra, 213 Conn. 240.

drawn therefrom. . . . This does not require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proven beyond a reasonable doubt because this court has held that a [fact finder's] factual inferences that support a guilty verdict need only be reasonable. . . . Nevertheless, because intent to cause the death of a person is an element of the crime . . . that intent must be proven beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 257–58, 681 A.2d 922 (1996). "Furthermore, [i]ntent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) Id., 257.

Walker, Murphy and the defendant testified at trial that they were driving around in search of McCoy and his friends in order to finish the nightclub fight and to retaliate for the vandalism to Murphy's car. All of the occupants of the Honda, except the defendant, testified that after the Hyundai passed the Honda, the defendant pulled out a nine millimeter gun, rolled down the passenger seat window, aimed at the Hyundai, which was two or three car lengths in front of the Honda, and fired a number of shots into the back of the Hyundai. The pathologist who performed the autopsy on the victim testified that the victim died of a gunshot wound to the back. Detective Smith testified at trial that a few hours after the shooting he found eleven bullet shell casings in the vicinity of the shooting. "We have stated that [o]ne who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn . . . that there was an intent

to kill." (Internal quotation marks omitted.) *State* v. *Tomasko*, supra, 238 Conn. 259; *State* v. *Mejia*, 233 Conn. 215, 225, 658 A.2d 571 (1995); *State* v. *Stanley*, 223 Conn. 674, 680, 613 A.2d 788 (1992).

" 'This court does not retry the case or evaluate the credibility of the witnesses.' " *State* v. *Taylor*, 23 Conn. App. 426, 429, 580 A.2d 1004 (1990). "Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the [trial court] if there is sufficient evidence to support the [trial court's] verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Mejia*, supra, 233 Conn. 224.

We conclude that the evidence presented at the defendant's trial was sufficient to support the trial court's finding beyond a reasonable doubt that the defendant possessed the requisite intent to kill the victim when he shot him.

### III

Finally, the defendant claims that there was insufficient evidence presented at the probable cause hearing for the trial court to find that there was probable cause that the defendant possessed the requisite intent to kill required for the offense of murder. He asserts, therefore, that the trial court was without personal jurisdiction to try him for the crime of murder. We disagree.

"Article first, § 8, of the Connecticut constitution, as amended, provides in part that [n]o person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by

law. . . . In making a finding of probable cause, the trial court must determine whether the evidence offered would warrant a person of reasonable caution to believe that the accused had committed the charged offense. . . . The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear [t]hat there is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992).

The state presented two witnesses at the probable cause hearing, Walker and Binns. Walker offered the following testimony. On the night of March 14-15, 1992, Murphy called him and asked him to come to Murphy's house. Walker called Dennis and the defendant. The defendant left his girlfriend's apartment with a nine millimeter gun in the waist of his pants. Once at Murphy's home, all four of these men got into Walker's Honda and went to find McCoy and his friends in order to retaliate for the nightclub fight. The two groups saw each other at a gas station. McCoy and his friends, who were in a Hyundai, began following Walker and his friends in the Honda. When the Hyundai passed the Honda, Walker saw a shotgun pointed at him from the back window of the Hyundai. Then, the defendant rolled down the passenger seat window of the Honda, stuck out his nine millimeter gun and began shooting at the back of the Hyundai.

Binns testified that on the night of March 14, 1992, he and his friends went to a nightclub in Stamford. Binns explained that at the nightclub one of his friends asked Murphy's girlfriend to dance and a fight ensued

between Binns' friends and Murphy's friends. Binns stated that later that night he and his friends were driving around in a Hyundai, following Murphy's friends, who were in a Honda. Binns testified that after he passed the Honda, someone in the Honda began shooting at the back of the Hyundai and shot the victim in the back. Binns testified that he drove the victim to a hospital and then went to the police station and gave a statement about the shooting. Binns testified that when he arrived at the police station he learned that the victim had died.

As we have already stated in our discussion of the defendant's second claim, intent to cause death may be inferred from the type of weapon used, the type of wound inflicted and the events leading to and immediately following the death. See *State* v. *Tomasko*, supra, 238 Conn. 257. Furthermore, an intent to kill can be inferred merely from the use of a deadly weapon on another person. See id. The evidence presented at the probable cause hearing established that, in retaliation for the nightclub incident, the defendant shot and killed the victim by firing a number of bullets from his nine millimeter gun into the back of the Hyundai, where the victim was seated. Therefore, it was reasonable for the trial court, *Quinn, J.*, to infer that the defendant had the requisite intent to kill the victim.

We conclude that the trial court had jurisdiction to try the defendant because the evidence offered at the probable cause hearing would have warranted a person of reasonable caution to find that the defendant possessed the intent to kill the victim.

The judgment is affirmed.

In this opinion the other judges concurred.