# STATE OF CONNECTICUT *v.* LONNIE MEBANE
## (SC 20750)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Dannehy and Gold, Js.

### *Syllabus*

Convicted of murder, criminal possession of a pistol or revolver, and carrying a pistol or revolver without a permit, the defendant appealed to this court. The defendant claimed, inter alia, that the trial court had violated his due process right to a fair trial by asking certain witnesses questions that favored the state and prejudiced him, and that the trial court had improperly instructed the jury on the presumption of innocence and his presence at the scene of the crime. *Held*:

The defendant failed to prove the existence of a constitutional violation in connection with the trial court's questioning of certain witnesses in an allegedly partisan manner, as that questioning was not so extensive, substantial, or adverse so as to impair the proper functioning of the jury or to call into question the impartiality of the trial judge.

The evidence was sufficient to support the defendant's murder conviction, as the jury could reasonably have found that the defendant had the conscious objective to cause the victim's death.

The defendant waived his unpreserved claims of instructional error, as defense counsel had a meaningful opportunity to review the jury instructions, the trial court solicited comments from counsel regarding changes or modifications, and defense counsel did not request any such changes or modifications but, rather, affirmatively accepted the challenged instructions on two occasions.

The challenged jury instructions were not so clearly, obviously, or indisputably erroneous as to require reversal of the defendant's conviction under the plain error doctrine.

(*One justice dissenting in part*)

Argued December 20, 2023—officially released August 20, 2024*

---

* August 20, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Mebane

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, murder, robbery in the first degree, criminal possession of a pistol or revolver, and carrying a pistol or revolver without a permit, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Hernandez, J.*; verdict and judgment of guilty of murder, criminal possession of a pistol or revolver, and carrying a pistol or revolver without a permit, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, *Colleen P. Zingaro*, supervisory assistant state's attorney, and *Edward Miller*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. Following a jury trial, the defendant, Lonnie Mebane, was convicted of murder, criminal possession of a pistol or revolver, and carrying a pistol or revolver without a permit in connection with the shooting death of the victim, Eric Diaz. In this direct appeal,[1] the defendant raises the following claims: (1) the trial court violated his due process right to a fair trial by asking three witnesses questions that favored the state and prejudiced the defendant, (2) the evidence was insufficient to support a reasonable inference that the defendant had the specific intent to kill the victim, and (3) the trial court improperly instructed the jury on the presumption of innocence and the defendant's presence at the scene of the crime. We affirm the judgment.

---

[1] See General Statutes § 51-199 (b) (3).

State *v.* Mebane

The jury reasonably could have found the following facts. The victim, who was nineteen years old, was selling drugs at the intersection of Newfield Avenue and Beardsley Street in Bridgeport on the night of September 14, 2017. Shortly before 10 p.m., the victim was approached by a medium sized Black man, who had a mole on his cheek and was wearing a bucket hat. The victim followed the man to a black sedan parked nearby. Both the victim and the man entered the car, and, shortly afterward, a fight ensued, during which the victim was shot once in the abdomen. The victim stumbled out of the car and collapsed on the sidewalk while the shooter sped away in the black car down Beardsley Street. The victim later died as a result of the gunshot wound.

After the shooting, the police collected video surveillance footage from the area. Some of the footage captured the events surrounding the murder, but the video quality was poor. It was difficult to determine the make and model of the vehicle and impossible to see inside the vehicle or to discern the physical characteristics of the victim or his assailant. The police nonetheless were able to determine that the black car was a late model Nissan Maxima with a broken rear passenger vent window on the right side. Because the victim was involved in the drug trade, the police employed the assistance of the statewide gang task force to identify the Nissan Maxima. Keith Hanson, a Bridgeport police officer and member of the task force, was able to identify the black Nissan Maxima from undercover drug surveillance he had conducted earlier that day. Hanson had observed a drug transaction that involved a black Nissan Maxima with a broken rear vent window, documented the license plate number of the vehicle, and determined that the registered owner was Frank Bridgeforth.

The police contacted Bridgeforth, who was ninety years old at the time. Bridgeforth confirmed that he was the registered owner of a black Nissan Maxima with a bro-

State *v.* Mebane

ken rear vent window but informed the police that it typically was driven by his foster son, the defendant. An alert was issued for the vehicle, which subsequently was located and towed to the police station. A later search of the interior of the vehicle revealed the presence of certain inorganic elements characteristic of gunshot residue.

On September 21, 2017, Bridgeforth voluntarily went to the Bridgeport Police Department and spoke to the lead detective assigned to the investigation, Jorge Cintron. During his conversation with Cintron, Bridgeforth received a call on his cell phone from the defendant. Cintron spoke to the defendant, who asked why the Nissan Maxima had been seized and when it would be returned. Cintron informed the defendant that it was seized pursuant to a search warrant in connection with a homicide investigation into the victim's murder. Cintron asked the defendant to come to the police station for questioning, but the defendant declined to do so. After the phone call, Bridgeforth refused to speak with Cintron any further without an attorney present.

The next day, Bridgeforth went to the Stratford Police Department to drop off a signed and notarized statement reporting three registered firearms as lost, one of which was a KelTec PF9 nine millimeter pistol. Bridgeforth explained in his statement that he accidentally had disposed of the firearms at the Stratford transfer station the day before the victim's murder. The police searched the Stratford transfer station but were unable to find the firearms. Subsequent forensic testing revealed that the bullet that killed the victim could have been fired from only thirty-three types of pistols, one of which is a KelTec PF9.

There were two eyewitnesses to the victim's murder, both of whom testified at the defendant's trial. Javon Gaymon, one of the eyewitnesses, was returning to his

State *v.* Mebane

car from a convenience store located on the corner of Newfield Avenue and Beardsley Street at approximately 9:55 p.m. on September 14, 2017, when he heard a noise that "caught [his] attention." Gaymon saw two men fighting in a black car parked approximately thirty feet away and noticed that "the young man was winning the fight, I guess. He was on top . . . ." Gaymon observed the white flash of a gunshot and saw the victim "stumble to the side and fall on the ground." Scared, Gaymon entered his car and fled. The police later identified Gaymon from video surveillance footage and interviewed him. During his police interview and at trial, Gaymon stated that he was "pretty sure" that Bridgeforth's Nissan Maxima was the black car he had seen that night.

The second eyewitness was Brishawn Beason, who was standing outside of the convenience store on the corner of Newfield Avenue and Beardsley Street shortly before 10 p.m. on September 14, 2017. Beason testified that he was a childhood friend of the victim and saw the victim enter a black car with a man whom he later identified as the defendant. Approximately two minutes later, Beason saw the victim exit the car bleeding and the car "pull[ing] off, going down Beardsley Street real fast." Beason fled the scene because he was afraid but, weeks later, came forward after the victim's sister made a plea for information concerning the victim's murder.

After Beason came forward, the police showed him a photographic array, from which he identified, with "1000 [percent]" certainty, a picture of the defendant as the person who had entered the car with the victim. Beason explained that he was able to identify the defendant because he got "a good look" at the defendant's face, he previously had seen the defendant around the neighborhood, and he recognized the defendant from the mole on his face. Beason also was shown photographs of Bridgeforth's Nissan Maxima, which he posi-

State *v.* Mebane

tively identified as the black car in which the victim had been shot.

The defendant was arrested and charged with felony murder in violation of General Statutes § 53a-54c, murder in violation of General Statutes § 53a-54a, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), criminal possession of a pistol or firearm in violation of General Statutes (Rev. to 2017) § 53a-217c (a) (1), and carrying a pistol or revolver without a permit in violation of General Statutes (Rev. to 2017) § 29-35 (a). Following a jury trial, the defendant was found not guilty of felony murder and robbery in the first degree but guilty of the remaining offenses. The trial court rendered judgment in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of sixty years of imprisonment. This appeal followed.

I

THE TRIAL COURT'S QUESTIONING OF
THREE WITNESSES

The defendant first claims that the trial court deprived him of his due process right to a fair trial by questioning three witnesses in a partisan manner that was prejudicial to the defendant. The defendant's claim is unpreserved, and he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[2] We conclude that the defendant's claim fails

_____

[2] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

State *v.* Mebane

under the third prong of *Golding* because he has not
established the existence of a constitutional violation.[3]

The following additional facts are relevant to our
disposition of this claim. During the state's case-in-
chief, Detective Martin Heanue of the Bridgeport Police
Department testified about the preparation and presen-
tation of the photographic array that led to Beason's
identification of the defendant. Heanue testified that
photographic arrays typically are prepared and pre-
sented to a witness by "a detective [who is] really not
overly involved with the investigation" so as not "to tip
the [witness'] hand as to the . . . photographs . . . ."
He explained that an array usually is composed of eight
photographs, one of which is of the suspect and the
other seven of which are computer chosen images of
individuals with similar physical characteristics. There
is no information identifying the individuals in the pho-
tographs, and the witness is informed that a suspect may
nor may not be present. In this case, the eight photo-
graphs were shuffled and presented to Beason, who
identified the photograph of the defendant as the person
he saw with the victim on the night of September 14,
2017, with "1000 [percent]" confidence.

On cross-examination, Heanue acknowledged that,
after Beason identified the defendant's photograph,
Beason asked, "[t]hat's him, right?" Heanue responded
by informing Beason that, "unfortunately, [he] couldn't
tell [Beason] if it was the right guy or not" and that

[3] The defendant has not asked us to exercise our supervisory authority over
the administration of justice to determine that the trial court's questioning
of the witnesses violated standards of judicial propriety in Connecticut. His
only claim is based on the requirements of the due process clause of the
fourteenth amendment to the federal constitution. See *Daye* v. *Attorney
General of New York*, 712 F.2d 1566, 1570–71 (2d Cir. 1983) (explaining
difference between federal due process standard governing claims of judicial
impropriety and "the stricter standards" established pursuant to federal
courts' supervisory authority), cert. denied, 464 U.S. 1048, 104 S. Ct. 723,
79 L. Ed. 2d 184 (1984).

State *v.* Mebane

he could "not give [Beason] any information." Heanue construed Beason's question as an attempt "to confirm his selection" and emphasized that Beason was "confident in his selection."

Following the state's redirect examination, the trial court asked Heanue, "just so I'm clear . . . you administered the photo[graphic] array, or you're selected to administer the photo[graphic] array, because you don't know anything about the investigation, is that correct?" Heanue responded, "[c]orrect." The trial court followed up this inquiry by asking Heanue, "[a]nd what's the purpose of doing that?" Heanue testified that "[t]he purpose of doing that is so that, for the members of the jury, if Detective Cintron went there alone and administered this photo[graphic] array, it [might] seem that he was being biased. The whole purpose of me going and doing it and not knowing much about the case, other than the few things that I knew, was to eliminate some of those biases that . . . would [make you] think that it was [the] police [that] railroaded him into picking somebody that, you know, he normally wouldn't have picked."

The trial court also questioned the defendant's two expert witnesses, Brooke W. Kammrath and Jamie Lincoln Kitman.[4] Kammrath, a professor of forensic science

_____

[4] Our review of the record reveals that the trial court also asked questions of other witnesses, although the defendant does not challenge the propriety of those questions on appeal. For example, the trial court questioned Marshall Robinson, the state's firearm and toolmark examiner, who testified that the nine millimeter bullet recovered from the victim's body could have been fired only from a list of certain firearms, one of which was a KelTec pistol. On cross-examination, defense counsel elicited testimony that the list included more than thirty firearms, which prompted Robinson to explain that it "probably looks like a large list, but it's really not a large list." Following the parties' questioning, the trial court stated that it had "a quick question. You . . . said that does not seem like a long list. What . . . did you mean by that?" Robinson clarified that, "if this list [of all firearms] were printed out, it would be like . . . the old Bridgeport phonebook. It's a . . . large list of firearms based on their rifling characteristics from all over the world, and it's a large list. Compared to the . . . number of firearms that are [on] this list, this is not a lot." The prosecutor followed up by asking:

350 Conn. 483 NOVEMBER, 2024 491

State *v.* Mebane

at the University of New Haven and assistant director of the Henry C. Lee Institute of Forensic Science, testified that the samples recovered from Bridgeforth's Nissan Maxima did not test positive for gunshot residue. Kammrath explained that gunshot residue has two essential characteristics: (1) the presence of three inorganic elements, namely, lead, antimony, and barium, and (2) a spherical morphology. According to Kammrath, the presence of only two of the three inorganic elements or the absence of a spherical morphology could be called "consistent with gunshot residue, but it's not gunshot residue because there are other materials that may also have that same elemental composition," such as brake linings. Kammrath reviewed the laboratory report generated by the state's forensic science examiner, Alison Gingell, and technical reviewer, Amy Duhaime,[5] and determined that the results were

"So, you're saying that . . . the phonebook full of all potential weapons is thousands and thousands of weapons that it could have come from. You narrowed it down to about thirty, thirty-three weapons that this could have come from?" Robinson responded, "[y]es."

Additionally, the trial court asked a question of Gregory Sawicki, a detective in the special licensing and firearms unit of the Connecticut state police, who was called as a witness by the state. Sawicki testified on direct examination that the defendant did not "hold a permit with the Connecticut state police . . . ." The trial court asked, "[j]ust so we're clear, when . . . you say a 'permit,' are you referring to a carry permit?" Sawicki responded, "[y]eah, a Connecticut state pistol permit."

[5] Gingell testified that three samples were taken from the Nissan Maxima and submitted for forensic analysis. Initially, all three samples tested negative for gunshot residue. However, a problem was found with the instrument used to test the samples, and they were retested using a different instrument.

Duhaime testified about the results of the second test for gunshot residue. According to Duhaime, the sample taken from the ceiling area between the front and back seats of the Nissan Maxima revealed the presence of one particle containing antimony and barium. The sample taken from the back-seat area of the Nissan Maxima revealed the presence of one particle containing antimony and barium, and one particle containing lead. The sample taken from the center console of the vehicle revealed the presence of one particle containing the elements of lead, antimony, and barium, and one particle containing lead. Duhaime explained that the particle containing all three elements of lead, antimony, and barium "is considered characteristic of primer gunshot residue," whereas the other particles with only two elemental

State *v.* Mebane

insufficient to establish the presence of gunshot residue because "there was no mention" of the morphology of the single particle containing all three elements, and "it's standard that you need three particles . . . containing lead, barium, and antimony, with the spheroid morphology, in order to positively identify something as gunshot residue."[6]

On cross-examination, the prosecutor asked Kammrath whether it was possible that the particle with all three elements of lead, antimony, and barium had a spherical morphology but that that fact was omitted from the laboratory report. Kammrath replied, "[i]t's possible, but it should have been in the report."

At the end of questioning, the following colloquy occurred between the trial court and Kammrath:

"The Court: I . . . just have a couple questions. Miss, are you familiar with Alison Gingell . . . ?

"[Kammrath]: Alison who?

"The Court: Alison Gingell.

"[Kammrath]: No, I'm not.

"The Court: What about Amy Duhaime?

components "are considered consistent with gunshot residue." Duhaime did not testify as to the morphology of any of the particles.

[6] The testimony of the state's expert witnesses, Gingell and Duhaime, was not inconsistent with Kammrath's testimony. Gingell explained that gunshot residue is composed of three elements, lead, antimony, and barium, all of which are "found in one particle and . . . form a sphere, a perfect sphere . . . ." However, she did not testify about the results of the second test performed in this case. See footnote 5 of this opinion. That task fell to Duhaime, who did not mention the morphology of the particles at issue. Furthermore, Duhaime never testified that any of the particles recovered from the Nissan Maxima were gunshot residue. Instead, she testified that one particle containing lead, antimony, and barium was "characteristic of" gunshot residue and that some other particles containing two elemental components of lead, antimony, and/or barium were "consistent with" gunshot residue.

State *v.* Mebane

"[Kammrath]: Yes.

"The Court: Alright. You're familiar with her. And were you present when either of them testified?

"[Kammrath]: No, I wasn't.

"The Court: Alright. So, you . . . don't know what their representations were about [the samples recovered from the Nissan Maxima]? Correct?

"[Kammrath]: Correct. I don't know."

After the trial court's questioning, defense counsel sought to ask Kammrath a follow-up question about the definition of "gunshot residue" propounded by the American Society for Testing and Materials, but the trial court interrupted and stated, "I think you're going beyond the scope here, Counsel. I asked about two witnesses . . . ." Defense counsel responded: "I understand, but we repeatedly referred to this as gunshot residue, so I believe that's a mischaracterization." The trial court replied that "[i]t'll be the jury's recollection as to what those witnesses said about the findings of the analyses."

Lastly, the court questioned Kitman, an automotive journalist and the president of Octane Film Cars, who testified that, in his expert opinion, the vehicle depicted in the video surveillance footage was not Bridgeforth's Nissan Maxima but, instead, most likely was a Chevrolet Impala. After examining Bridgeforth's Nissan Maxima and watching the surveillance video footage, Kitman determined that Bridgeforth's Nissan Maxima had very little or no tint on the windows, whereas the car in the video had heavily tinted windows. Kitman explained that he had arrived at this conclusion because it was possible to see light emanating from within and outside of other cars in the video, but the black car that the victim entered was "completely blacked out. And that is differ-

Page 40

CONNECTICUT LAW JOURNAL

November 19, 2024

494

NOVEMBER, 2024

350 Conn. 483

State *v.* Mebane

ent than what you would have gotten with [Bridgeforth's Nissan Maxima].''

Kitman's expert opinion also was based on other differences he discerned between Bridgeforth's Nissan Maxima and the car depicted in the video. For example, Bridgeforth's Nissan Maxima had ''a chrome strip along the trunk'' that did not extend to the taillight, whereas the car in the video had a chrome strip that extended all the way to the taillight. Additionally, the car in the video did not have a third brake light, unlike Bridgeforth's car, and there were differences between the designs of the headlights and taillights. Moreover, the logo on the car in the video did ''not mirror the Nissan logo, which is . . . round with a cross bar,'' but, instead, was ''more of an oval shape and possibly . . . consistent with . . . a Chevrolet Impala.''

On cross-examination, the prosecutor asked Kitman, ''other than blacked out tinting, [there are] other things that may obscure somebody [from] seeing the inside of a car, correct?'' The prosecutor asked whether it would be possible to see inside the car if the windows were covered with something like a curtain. Kitman acknowledged that, if the windows were covered, it ''wouldn't be [possible] to see inside . . . or outside'' the car. Additionally, Kitman acknowledged that there is usually a way to disable the interior lights to prevent them from illuminating when the car doors are opened.

Following questioning, the trial court indicated that it had ''a couple of questions,'' and the following exchange occurred:

''[The Court]: Sir, the Maxima that you examined on May—

''[Kitman]: 3rd.

''[The Court]: May 3rd?

State *v.* Mebane

"[Kitman]: Yes, sir.

"[The Court]: What year was that?

"[Kitman]: 2011.

"[The Court]: That's the make of the car. What year did you examine the vehicle?

"[Kitman]: I said 2011.

"[The Court]: Okay. So you believe you examined the vehicle in 2011?

"[Kitman]: Oh, no. It was May 3, 2022.

"[The Court]: Okay. Thank you. Alright. So, 2011 is the model year of the Maxima that you examined?

"[Kitman]: I believe, yes.

"[The Court]: Alright. And do you know if that year model had a device in the car that would allow you to dim the dashboard lights?

"[Kitman]: I don't specifically, but I assume that you could dim them.

"[The Court]: That's a pretty—that's been around for a long time, right?

"[Kitman]: Mm-hmm.

"[The Court]: You can make the dashboard brighter?

"[Kitman]: You can—most cars you can. I mean, for the last seventy-five years, I think you could dim the lights.

"[The Court]: And do you know if the 2011 Maxima had a pull up sunshade in the back door window?

"[Kitman]: I don't believe so."

Defense counsel did not object to any of the trial court's questions or request a jury instruction pertaining to the court's questioning of the witnesses. In its general

State *v.* Mebane

jury instructions to the jury, the trial court cautioned that its "actions during the trial in ruling on motions or objections by counsel, or in comments to counsel, or in setting forth the law in these instructions, are not to be taken by [the jury] as any indication of [the court's] opinion as to how [the jury] should determine or resolve questions of fact."

A trial court indisputably possesses the discretion to question a witness during direct or cross-examination, and the court's exercise of discretion will not be disturbed unless it has "acted unreasonably, or, as it is more often expressed, [has] abused [its] discretion." (Internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 652, 881 A.2d 1005 (2005). Neutral questioning of a witness is appropriate "to clarify confusing testimony, to restrain an obstreperous witness, or to elucidate a [witness'] understanding of a question." *State* v. *Smith*, 200 Conn. 544, 549, 512 A.2d 884 (1986). Additionally, "it is proper for a trial court to question a witness in endeavoring, without harm to the parties, to bring the facts out more clearly and to ascertain the truth," and when "the witness is embarrassed, has a language problem or may not understand a question." (Internal quotation marks omitted.) *State* v. *Fernandez*, 198 Conn. 1, 13, 501 A.2d 1195 (1985).

Any such questioning, however, must be conducted with great care because the trial judge occupies a unique and prominent position in the courtroom as the embodiment of neutrality and fairness. As a consequence, it is critically important that the trial court exercise its discretion to question a witness with judicious prudence, and it "should never assume a position of advocacy, real or apparent, in a case before it, and should avoid any displays of hostility or skepticism toward the defendant's case, or of approbation for the prosecution's [case]." *State* v. *Smith*, supra, 200 Conn. 549. A high degree of caution is especially imperative in a jury

State *v.* Mebane

trial. The jury views the judge as authoritative, takes its guidance from the judge with regard to virtually every aspect of the proceedings, and can be expected to place heavy weight on everything the judge says and does. As a result, the trial court's "obligation to comport itself in a circumspect and dispassionate manner" is particularly acute "in the presence of the jury, which may readily be influenced by a judge's words or conduct . . . ." Id. The "jury has a natural tendency to look to the trial judge for guidance, and may find it even where it is not intended. The judge's attitude and the result he supposedly desires may be inferred by the jury from a look, a lifted eyebrow, an inflection of the voice—in many cases without warrant in fact." (Internal quotation marks omitted.) *State* v. *Fernandez*, supra, 198 Conn. 12; see also *Quercia* v. *United States*, 289 U.S. 466, 470, 53 S. Ct. 698, 77 L. Ed. 1321 (1933) ("[t]he influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling" (internal quotation marks omitted)).

For this reason, we have cautioned trial courts to err on the side of intervening too little rather than too much, particularly in criminal cases. See *State* v. *Fernandez*, supra, 198 Conn. 11 (trial court should "be aware that there may be greater risk of prejudice from overintervention than from underintervention" (internal quotation marks omitted)); id., 16 (trial court's examination of witnesses should be done "with caution and circumspection lest an appearance of partiality, although not intended, emerge"); see also *State* v. *Cianflone*, 98 Conn. 454, 469, 120 A. 347 (1923) ("[t]he difficulty in a protracted examination of separating the judge from the advocate will lead the trial court to refrain from such examination save under exceptional circumstances").

A trial court's abuse of discretion in questioning a witness may implicate a defendant's due process right

State *v.* Mebane

to "a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm." (Internal quotation marks omitted.) *State* v. *Fernandez*, supra, 198 Conn. 10. "The risk of constitutional judicial misconduct is greatest in cases [in which] the trial court has interceded in the merits of the trial." *State* v. *Woodson*, 227 Conn. 1, 31, 629 A.2d 386 (1993). For example, we have concluded that a criminal defendant's constitutional right to a fair trial was violated when the credibility of a witness was key to the outcome of the jury's verdict and the trial court questioned that witness in a manner that tended to bolster or undermine the witness' credibility in the eyes of the jurors. See *State* v. *Smith*, supra, 200 Conn. 550–51 (trial court's questioning was improper because "[t]he outcome of the trial depended largely on the jury's assessments of the respective credibility of [the state's witness] and the defendant," and because trial court questioned state's witness "in a manner that tended to enhance the [witness'] credibility in the [jurors'] eyes"); *State* v. *Fernandez*, supra, 14, 17 (trial court's questioning of defendant's sole witness, who testified that "*he*, and *not* the defendant, had committed the crimes charged," was improper and deprived defendant of fair trial (emphasis in original)).

The line between permissible and impermissible questioning is not always easy to delineate. We have endorsed the observation of Judge Irving R. Kaufman of the United States Court of Appeals for the Second Circuit that " '[t]here is simply no handy tool with which to gauge a claim that a judge's conduct improperly has shifted the balance against a defendant.' " *State* v. *Fernandez*, supra, 198 Conn. 13, quoting *United States* v. *Nazzaro*, 472 F.2d 302, 304 (2d Cir. 1973). "Such a decision is reached only after the most thorough and careful deliberation, as in such cases the court faces a special quandary stemming from the fact that [the court is] not given the benefit of witnessing the juxtaposition of personali-

State *v.* Mebane

ties which may help prevent reading too much into the cold black and white of a printed record.'' (Internal quotation marks omitted.) *State* v. *Fernandez*, supra, 13; see *State* v. *Gonzalez*, 272 Conn. 515, 536, 864 A.2d 847 (2005) (''[u]nlike an appellate court, the trial court is able to observe the testimony of witnesses firsthand and, therefore, is better able to assess the relative clarity— or lack thereof—of any particular testimony'').

Because a trial court's questioning of a witness is fraught with risk, even when its ''intentions [are] entirely benevolent''; *State* v. *Smith*, supra, 200 Conn. 553; it is generally preferable, when practicable, ''for the trial judge to discuss the matter with counsel outside the presence of the jury and [to] request counsel to pose the questions to the witness.''[7] (Internal quotation marks omitted.) *State* v. *Hays*, 256 Kan. 48, 52, 883 P.2d 1093 (1994); see also *People* v. *Nieves*, 11 Cal. 5th 404, 498, 485 P.3d 457, 278 Cal. Rptr. 3d 40 (2021) (''it is ordinarily the better practice for the trial court to let counsel develop the case'' (internal quotation marks omitted)); *State* v. *Giordano*, 440 A.2d 742, 745 (R.I. 1982) (trial court should question witness only after ''first allow[ing] counsel every opportunity to refine the [witness'] testimony''); *Auger* v. *Auger*, 149 Vt. 559, 562, 546 A.2d 1373 (1988) (''It is the better practice to allow counsel the opportunity to develop the facts in the first instance. Counsel is in a better position to do so.''). Alternatively, if the trial court exercises its discretion to question a witness, the court should instruct the jury, consistent with instruction 2.1-2 of our model criminal jury instructions, that the court's questions to witnesses should not be taken by the jury as an indication of its opinion as

_____

[7] We recognize that trial courts, on occasion, may deem it appropriate during a witness' testimony to interject a question for the limited purpose of immediately clarifying an imprecise word or reference. The preferable practice we identify in the body of this opinion is not intended to apply to or restrict the trial court's use of that type of nonsubstantive questioning.

State *v.* Mebane

to how the jury should resolve any issues of fact. See Connecticut Criminal Jury Instructions 2.1-2, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited August 19, 2024).[8]

The narrow issue before us is not whether the trial court's questioning of the witnesses comported with best practices but, rather, whether it deprived the defendant of his due process right to a fair trial before an impartial judge and unprejudiced jury. On the basis of our thorough review of the entire record, we cannot conclude that the trial court's intervention was so extensive, substantial, or adverse as to impair the proper functioning of the jury or to call into question the impartiality, real or perceived, of the trial judge. See, e.g., *State* v. *Mack*, 197 Conn. 629, 638, 500 A.2d 1303 (1985) (defendant was unable to prevail on unpreserved claim because, although some of trial court's questions and comments were improper, "none of them [rose] to the level of constitutional error"); *State* v. *Peloso*, 109 Conn. App. 477, 491, 952 A.2d 825 (2008) ("[a] trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the [finder of fact] or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits" (internal quotation marks omitted)), quoting *Daye* v. *Attorney General of New York*, 712 F.2d 1566, 1572 (2d Cir. 1983), cert. denied, 464 U.S. 1048, 104 S. Ct. 723, 79 L. Ed. 2d 184 (1984).

The defendant's trial spanned several days and involved the testimony of twenty-four witnesses. Despite the volume

---

[8] Instruction 2.1-2 of the Connecticut model criminal jury instructions provides in relevant part: "You should not be influenced by my actions during the trial in ruling on motions or objections by counsel, or in comments to counsel, *or in questions to witnesses*, or in setting forth the law in these instructions. You are not to take my actions as any indication of my opinion as to how you should determine the issues of fact. . . ." (Emphasis added.) Connecticut Criminal Jury Instructions 2.1-2, supra.

State *v.* Mebane

of testimonial evidence, the defendant's constitutional challenge is limited to the trial court's brief questioning of three witnesses, one of whom testified on behalf of the state. See *State* v. *Bember*, 183 Conn. 394, 402, 439 A.2d 387 (1981) (finding it significant that "the trial court asked questions of both prosecution and defense witnesses"); see also footnote 4 of this opinion. With respect to the testimony of the state's witness, Heanue, the trial court asked two discrete questions intended to elicit additional information regarding the preparation of the photographic array and its presentation to Beason. Given the brevity of the trial court's questions and the fact that the integrity of the array was not challenged at trial, we conclude that the trial court's questioning of Heanue, although unnecessary, was unlikely to influence the jury's verdict or its perception of the judge's neutrality. See, e.g., *State* v. *Iban C.*, supra, 275 Conn. 655 (concluding that trial court's brief questions on discrete issue did not contain "a suggestion of advocacy"); *State* v. *Rosario*, 209 Conn. App. 550, 565, 267 A.3d 946 ("the court's questions did not prejudice the defendant because the relevant elicited facts were not truly in dispute"), cert. denied, 342 Conn. 901, 270 A.3d 98 (2022).

Likewise, the trial court's short series of questions to the defendant's expert witnesses did not rise to the level of a constitutional violation. The few questions posed to Kammrath regarding her familiarity with the in-court testimony of the state's expert witnesses were ill-advised and best left unasked by the court because they could have been perceived to suggest, at least vaguely and by implication, that Kammrath was unaware of the opinions offered by these witnesses or that the judge believed that the testimony of the state's expert witnesses contained information that Kammrath may have overlooked. But the questions did not cross the constitutional line into advocacy or partiality; the fact that Kammrath may not have been present in the courtroom when the state's expert witnesses testified does not provide a meaningful or effectual critique of Kammrath's expert

State *v.* Mebane

opinion, and we will not attribute more significance to the impact of the trial court's questions on the jury than is warranted.

As for the trial court's questioning of Kitman, the jury was well aware that there were various reasons why the interior of the car depicted in the video surveillance footage may have appeared dark other than the presence of a heavy tint on the windows. On cross-examination, Kitman agreed with the prosecutor that there are "other things that may obscure somebody [from] seeing the inside of a car" other "than blacked out tinting . . . ." For example, the interior lights could have been disabled or the windows might have been covered or blacked out. The trial court's questions excluded an additional possible reason, the presence of a sunshade, but prompted another, the dimming of the dashboard lights. The trial court's questions did not exhibit the restraint or caution that the circumstances demanded, but neither did they cross the line between judicial neutrality and partisan advocacy. Accordingly, the defendant's claim fails under the third prong of *Golding*.

## II

## SUFFICIENCY OF THE EVIDENCE OF INTENT

We next address whether the evidence was sufficient to support the defendant's murder conviction. The defendant claims that the evidence was insufficient for the jury reasonably to find that he had the specific intent to kill the victim because "[f]iring only one shot amid a struggle at a nonvital body part simply does not mean there was an intent to kill," especially in the absence of "evidence of any prior relationship between the defendant and [the victim], or of any animosity between the two men."[9] The state responds that "the evidence supported a reasonable inference that the defendant intended to kill the victim when he shot him

---

[9] The defendant does not claim that the evidence was insufficient to establish his identity as the perpetrator of the homicide but contends that "there simply was not sufficient evidence to find an intent to kill."

350 Conn. 483 NOVEMBER, 2024 503

State *v.* Mebane

in the torso at close range with a nine millimeter pistol.'' We agree with the state.

To prove the defendant guilty of the crime of murder, the state was required to prove beyond a reasonable doubt that the defendant had the specific intent to kill the victim, meaning that he ''had the conscious objective to cause the death of the victim.'' (Internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 783, 760 A.2d 82 (2000). ''[T]he state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually [proven] by circumstantial evidence . . . .'' (Internal quotation marks omitted.) *State* v. *Bonilla*, 317 Conn. 758, 766, 120 A.3d 481 (2015). For example, an intent to kill may be inferred from such circumstantial evidence as ''the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death.'' (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 66–67, 43 A.3d 629 (2012). In particular, use of ''a deadly weapon [on] a vital part of another'' supports a reasonable inference that an assailant ''intended the probable result of that act'' and harbored ''an intent to kill.'' (Internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 259, 681 A.2d 922 (1996). Additionally, we have often observed that ''it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct.'' (Internal quotation marks omitted.) *State* v. *Best*, 337 Conn. 312, 320, 253 A.3d 458 (2020).

Construing the evidence in the light most favorable to sustaining the jury's verdict,[10] we conclude that it was suffi-

_____

[10] In reviewing insufficiency of the evidence claims ''we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom, the [jury] reasonably could have

State *v.* Mebane

cient, beyond a reasonable doubt, to support the jury's finding that the defendant had the conscious objective to cause the death of the victim by shooting him with a nine millimeter pistol at close range in a vital part of his body. James Gill, the state's chief medical examiner, testified that the victim was shot "in the left lower quadrant of [his] abdomen, so the lower part of his . . . trunk . . . ." According to Gill, "after the gunshot entered, it went through a major bone in the pelvis and then injured a major vein, the iliac vein, which is a large vein that is coming from the leg returning the blood to the heart, and it injured that . . . caus[ing] internal bleeding. And that bleeding is what ultimately led to [the victim's] death." In light of the location of the victim's gunshot wound and the grievous nature of the injury inflicted, we reject the defendant's argument that the victim was not shot in a vital part of his body. See, e.g., *State* v. *Murray*, 254 Conn. 472, 480–81, 757 A.2d 578 (2000) (specific intent to kill reasonably may be inferred from single gunshot wound to victim's upper thigh); *State* v. *Gill*, 178 Conn. App. 43, 49–51, 173 A.3d 998 (specific intent to kill reasonably may be inferred from single gunshot wound to victim's torso), cert. denied, 327 Conn. 987, 175 A.3d 44 (2017); *State* v. *White*, 127 Conn. App. 846, 852–54, 17 A.3d 72 (single gunshot wound to victim's neck supported finding of specific intent to kill), cert. denied, 302 Conn. 911, 27 A.3d 371 (2011).

The events immediately preceding the victim's death also support the jury's factual finding that the defendant intended to kill the victim. The jury heard that, right before the shooting, the defendant and the victim were engaged in a physical fight, which it appeared the victim was winning. At least in combination with other circumstantial evidence, an intent to kill reasonably may be inferred from evidence indicating that the defendant and the victim were arguing prior to the victim's death, especially if that argument escalated into

concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Abraham*, 343 Conn. 470, 476, 274 A.3d 849 (2022).

violence.[11] See, e.g., *State* v. *Gary*, 273 Conn. 393, 409, 869 A.2d 1236 (2005) ("we conclude that the jury reasonably could have found that the evidence that [the victim] and the defendant had been involved in an altercation and that [the victim] had punched the defendant supported an inference that the defendant had a motive to kill [the victim]"); *State* v. *Edwards*, 247 Conn. 318, 322, 721 A.2d 519 (1998) (evidence was sufficient to establish that defendant had specific intent to kill victim because "there was eyewitness testimony that the defendant and the victim were arguing prior to the shooting, and that the defendant shot the victim in the head at close range"); *State* v. *Chace*, 199 Conn. 102, 105–106, 505 A.2d 712 (1986) (evidence that defendant stabbed victim multiple times during "a 'heated' argument" was sufficient to establish defendant's specific intent to kill victim); *State* v. *Gill*, supra, 178 Conn. App. 50 (evidence that defendant shot victim once following "a 'scuffle' " was sufficient to support jury's finding that defendant intended to kill victim).

Additionally, the defendant's conduct immediately following the shooting is indicative of his intent. After inflicting a fatal gunshot wound, the defendant fled the scene without aiding the victim or summoning emergency medical assistance. As we explained in *State* v. *Sivri*, 231 Conn. 115, 646 A.2d 169 (1994), "it can be inferred that, if the defendant has caused a grievous wound that could cause the victim's death if not treated promptly, the failure to summon that treatment is consistent with an antecedent intent to cause

---

[11] The defendant points out that, by finding the defendant not guilty of the crimes of felony murder and robbery in the first degree, the jury necessarily rejected the state's theory that "the defendant's motive was to rob [the victim] of either drugs, money, or his [jewelry]." The fact that the defendant did not intend to rob the victim, however, does not mean that the defendant did not intend to kill the victim. Even if the fight between the two men was prompted by something fleeting, trivial, or inconsequential, "[t]he [jurors were] not required to close [their] eyes to the unfortunate reality that murders frequently are committed in response to seemingly minor provocations." *State* v. *Gary*, 273 Conn. 393, 408, 869 A.2d 1236 (2005).

State *v.* Mebane

death.'' Id., 129; see, e.g., *State* v. *Mejia*, 233 Conn. 215, 225, 658 A.2d 571 (1995) (''the jury was free to infer an intent to kill from the defendant's failure to attempt to aid [the victim] or to show concern for [the victim's] welfare''); see also *State* v. *Tomasko*, supra, 238 Conn. 259. The inference may be stronger or weaker depending on all of the circumstances, but, if reasonable, it is something that the jury may consider in determining intent.

We recognize that ''the evidence certainly did not *mandate* an inference of an intent to kill . . . .'' (Emphasis in original.) *State* v. *Otto*, supra, 305 Conn. 74. The jury reasonably could have found that the shooting was accidental, intended to incapacitate the victim rather than to kill him, or intended to cause the victim's death. Because intent is subjective, the perpetrator's state of mind often is unknown and unknowable. See, e.g., *Oregon* v. *Kennedy*, 456 U.S. 667, 679, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982) (Powell, J., concurring) (observing, in context of prosecutorial misconduct, that '' 'subjective' intent often may be unknowable''). But this metaphysical condition of ultimate uncertainty does not, as a matter of law, prevent a fact finder from drawing reasonable inferences to conclude, beyond a reasonable doubt, that a defendant intended to cause a victim's death. We conclude, after a thorough review of the record in the present case, that the evidence was sufficient to support the defendant's murder conviction.

III

JURY INSTRUCTIONS

Lastly, we address the defendant's two challenges to the trial court's jury instructions. First, the defendant claims that the trial court improperly instructed the jury that it must return a verdict of not guilty ''[i]f the state fails to prove *each* of the elements of the charged offense beyond a reasonable doubt,'' rather than *any* of the elements of the charged offense. (Emphasis added.) Second, the defendant claims that the court improperly instructed the jury that the defen-

State *v.* Mebane

dant's "mere presence at the scene of [the] crime is insufficient to convict [the defendant] of the charged offenses" because the charge undermined the defendant's defense that he was not present at the scene of the crime, thereby invading the fact-finding province of the jury and relieving the state of its burden of proving the essential element of identity beyond a reasonable doubt. The defendant did not preserve either of his instructional claims and seeks to prevail on appeal under *State* v. *Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, supra, 317 Conn. 781, and the plain error doctrine. The state contends that the defendant's claims have been waived pursuant to *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011), and that there was no plain error necessitating the reversal of the defendant's conviction. We agree with the state.

The following additional facts are relevant to our resolution of these claims. Midway through the defendant's trial, on May 13, 2022, the trial court informed the prosecutor and defense counsel that it would "email [a] first draft of the jury charge tonight." The prosecutor requested certain jury instructions, and the trial court asked defense counsel, "any special instructions?" Defense counsel requested a special credibility instruction for "a couple witnesses who [had] pending felony charges" and an expert witness instruction for Kammrath and Kitman.

Four days later, on May 17, 2022, the defense rested, and the trial court conducted a jury charge conference on the record. At the charge conference, the trial court mentioned that it had earlier emailed counsel a draft of the proposed jury instructions. The trial court provided the prosecutor and defense counsel with printed copies of those instructions and marked and preserved a copy as an exhibit. The trial court went through the proposed instructions page by page and asked the prosecutor and defense counsel whether they had any exceptions. Relevant to the present appeal, the proposed instruction on the presumption of innocence provided in relevant part that, "[i]f the state fails to prove

State *v.* Mebane

*each* of the elements of the charged offense beyond a reasonable doubt, then you must return a verdict of not guilty.'' (Emphasis added.) Additionally, the proposed instruction regarding the element of identity provided in relevant part: "The state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the charged offenses. *The defendant's mere presence at the scene of a crime is insufficient to convict him of the charged offenses.* Rather, the state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the crime. *It is not enough for the* [*s*]*tate simply to prove that he was present when the offenses* [*were*] *allegedly committed.*'' (Emphasis added.) When the trial court asked defense counsel whether he had any exception to either of these proposed instructions, defense counsel responded, "[n]o, Your Honor.'' There were a few changes requested by the prosecution, none of which related to the instructions at issue on appeal.

At the end of the charge conference, the trial court stated that it would make the requested changes and that, if counsel wanted to wait around for a few minutes, it would provide them with a printed copy of the revised instructions. Both the prosecutor and defense counsel informed the court that they would prefer to receive their copies via email, to which the court responded, "[c]onsider it done.'' The trial court then adjourned proceedings for the day.

At 12:20 p.m. the next day, following closing arguments, the trial court instructed the jury on the law, consistent with what had been discussed at the charge conference, including the challenged instructions set forth in the preceding paragraph. After instructing the jury, the trial court inquired whether the prosecutor or defense counsel had "any exception to the charge . . . as given,'' and defense counsel responded, "[n]o, Your Honor . . . .''

In *Kitchens*, this court held that, "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solic-

its comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal.'' *State* v. *Kitchens*, supra, 299 Conn. 482–83. Under *Kitchens*, an unpreserved claim of improper jury instructions is unreviewable under the third prong of *Golding* if the claim has been implicitly waived by defense counsel. See id., 468. ''Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case.'' Id., 483.

Our close examination of the record reveals that defense counsel had a meaningful opportunity to review the jury instructions because he was given an advance copy of the instructions approximately four days before the charge conference, the instructions were reviewed page by page at the charge conference, and defense counsel subsequently had the opportunity to review the instructions overnight. See, e.g., *State* v. *Webster*, 308 Conn. 43, 63, 60 A.3d 259 (2013); *State* v. *Mungroo*, 299 Conn. 667, 675–76, 11 A.3d 132 (2011); *State* v. *Akande*, 299 Conn. 551, 561–62, 11 A.3d 140 (2011). The record reflects that the trial court solicited comments from counsel regarding changes or modifications, that defense counsel did not request any changes or modifications, and that defense counsel affirmatively accepted the challenged instructions twice, once at the charge conference and again after the instructions were read to the jury. See, e.g., *State* v. *Bellamy*, 323 Conn. 400, 410, 147 A.3d 655 (2016); *State* v. *Darryl W.*, 303 Conn. 353, 368, 33 A.3d 239 (2012); *State* v. *Joseph*, 174 Conn. App. 260, 281, 165 A.3d 241, cert. denied, 327 Conn. 912, 170 A.3d 680 (2017). Consistent with the principles set forth in *Kitchens* and its progeny, unchallenged by the defen-

State *v.* Mebane

dant in the present case,[12] we conclude that the defendant's instructional claims have been waived.

The defendant also seeks review under the plain error doctrine. See *State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017) ("a *Kitchens* waiver does not preclude plain error review"). To prevail, the defendant must satisfy the two-pronged plain error test. "First, the defendant must establish that there was an obvious and readily discernable error . . . . Second, the defendant must establish that the obvious and readily discernable error was so harmful or prejudicial that it resulted in manifest injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Diaz*, 348 Conn. 750, 762–63, 311 A.3d 714 (2024). The plain error doctrine is a rule of reversibility, not reviewability, and the defendant is not entitled to relief unless "the alleged error is *both* so clear *and* so harmful that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Emphasis in original; internal quotation marks omitted.) Id., 763; see also *State* v. *McClain*, supra, 813–14 ("[T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. . . . Put another way, plain error is reserved for only the most egregious errors. When an error of such magnitude exists, it necessitates reversal." (Citation omitted; internal quotation marks omitted.)).

The first prong of the plain error analysis, as applied to instructional claims, requires us to "read [the charge] as a whole," and emphasizes that "individual instructions are not to be judged in artificial isolation from the overall charge. . . . In reviewing the charge as a whole, [the] instructions need not be perfect, as long as they are legally correct, adapted to the issues and sufficient for the jury's guidance. . . . The test to be

[12] See *State* v. *Bellamy*, supra, 323 Conn. 403, 422–23 (declining to overrule *Kitchens* in divided opinion).

State *v.* Mebane

applied to any part of a charge is whether the charge considered as a whole presents the case to the jury so that no injustice will result.'' (Internal quotation marks omitted.) *State* v. *Blaine*, 334 Conn. 298, 308, 221 A.3d 798 (2019); see also *State* v. *Kyle A.*, 348 Conn. 437, 447, 307 A.3d 249 (2024) (jury instruction is not improper simply because it is not consistent with ''the better practice''). As we recently observed in *Kyle A.*, it is ''especially rare for a jury instruction to be so clearly improper that our courts have deemed plain error review necessary to correct it.'' *State* v. *Kyle A.*, supra, 448. ''[T]he reluctance with which we have chosen that course underscores that plain error is reserved for only the most egregious defects.'' Id.

Having reviewed the jury instructions in their entirety, we conclude that the challenged instructions were not clearly, obviously, or indisputably erroneous. See, e.g., *State* v. *Darryl W.*, supra, 303 Conn. 373 (emphasizing plain error's ''relatively high standard'' and explaining that ''it is not enough for the defendant simply to demonstrate that his position is correct'' but, instead, must demonstrate that claimed error was ''clear, obvious and indisputable'' (internal quotation marks omitted)). The trial court's instruction on the presumption of innocence was imperfect in its use of a single word, but the jury instructions as a whole made it abundantly clear that the state was required to prove each and every element of the crime beyond a reasonable doubt, and no reasonable juror would have been misled to think otherwise. The trial court informed the jury that ''[t]he defendant does not have to prove his innocence'' and that ''the state must prove beyond a reasonable doubt each and every element necessary to constitute the crimes charged.'' With respect to the crime of murder in particular, the court instructed the jury that ''the state must prove the following elements beyond a reasonable doubt'': intent to cause death and

State *v.* Mebane

proximate cause resulting in death. The court repeatedly emphasized the state's burden to prove each of these essential elements beyond a reasonable doubt and, in summary, informed the jury that "the state must prove beyond a reasonable doubt that (1) the defendant intended to cause the death of another person, and (2) in accordance with that intent, the defendant caused the death of [the victim]." On the basis of these instructions, we conclude that "there was no possibility that the jury was improperly led to believe that it could find the defendant not guilty only if the state failed to prove every element of the offense beyond a reasonable doubt." *State* v. *Singleton*, 292 Conn. 734, 770, 974 A.2d 679 (2009); see id., 769–770 (concluding, after reviewing jury instructions in their entirety, that there was no reasonable possibility that jury was misled by instruction that it could "find the defendant not guilty if the state failed to prove 'each,' instead of 'any,' element of manslaughter in the first degree"); *State* v. *Wade*, 106 Conn. App. 467, 491–92, 942 A.2d 1085 (reviewing "the court's entire instruction to the jury" and finding no "meaningful distinction" between instructing jury that it must find defendant not guilty if state failed to prove each, as opposed to any, of essential elements of charged crimes beyond reasonable doubt), cert. granted, 287 Conn. 908, 950 A.2d 1286 (2008) (appeal withdrawn June 11, 2008).

With respect to the trial court's instruction on mere presence at the scene of the crime, we reject the defendant's claim that this instruction improperly invaded the province of the jury, relieved the state of its burden of proof, or prejudiced the defendant's defense of mistaken identity. The trial court explicitly instructed the jury that "[t]he state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the charged offenses. . . . Identification is a question of fact for you to decide, taking into consider-

350 Conn. 483 NOVEMBER, 2024 513

State *v.* Mebane

ation all the evidence that you have seen and heard in the course of the trial. . . . [T]he state's evidence must satisfy you that it has proven the defendant's identity beyond a reasonable doubt. It is for you to decide how much weight to place [on] such evidence." Additionally, the trial court informed the jury that its instructions on the law "are not to be taken by you as any indication of [its] opinion as to how you should determine or resolve questions of fact." The trial court's instructions as a whole accurately conveyed the law to the jury, and there was no clear, obvious, or indisputable error.[13] Moreover, although the defendant denied being present at the crime scene, the "mere presence" charge protected him against the possibility that the jury might have otherwise drawn the wrong inference from his presence if it had concluded that he was, in fact, there.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and McDONALD, MULLINS, DANNEHY and GOLD, Js., concurred.

D'AURIA, J., dissenting in part. Because I cannot conclude, as the majority does, that the trial court's unnecessary questioning of the defendant's two expert witnesses, Brooke W. Kammrath and Jamie Lincoln Kitman,

---

[13] The defendant points out that the model jury instruction on "Identification of Defendant" on the Judicial Branch website does not contain the mere presence language. See Connecticut Criminal Jury Instructions 2.6-4, supra. As we previously have observed, the language of the model jury instructions, although instructive, is not binding. See, e.g., *State* v. *Calhoun*, 346 Conn. 288, 298, 289 A.3d 584 (2023) ("[j]ury instructions are not 'one size fits all formulations,' which is why trial courts must sometimes modify jury instructions to meet the needs of a case"); *State* v. *Ortiz*, 343 Conn. 566, 599, 275 A.3d 578 (2022) ("[T]he language used in the model jury instructions, although instructive in considering the adequacy of a jury instruction . . . is not binding on this court. . . . [W]e previously have cautioned that the . . . jury instructions found on the Judicial Branch website are intended as a guide only, and that their publication is no guarantee of their adequacy." (Internal quotation marks omitted.)).

State *v.* Mebane

"was [not] so extensive, substantial, or adverse" as to deprive the defendant of a fair trial, I respectfully dissent as to part I of the majority opinion and would order a new trial. I do not reach parts II and III of the majority opinion.

The majority opinion has much to commend it. It is researched thoroughly and written persuasively. It is also candid in describing the challenged questions of the trial court as "unnecessary," "ill-advised and best left unasked," and "not exhibit[ing] the restraint or caution that the circumstances demanded . . . ." I agree with the majority that "[t]he line between permissible and impermissible questioning is not always easy to delineate" and that, as we have stated before, "[t]here is simply no handy tool with which to gauge a claim that a judge's conduct improperly has shifted the balance against a defendant." (Internal quotation marks omitted.) Part I of the majority opinion, quoting *State* v. *Fernandez*, 198 Conn. 1, 13, 501 A.2d 1195 (1985), and *United States* v. *Nazzaro*, 472 F.2d 302, 304 (2d Cir. 1973). Ultimately, whether a trial court's active questioning of witnesses deprives a defendant of a fair trial is a matter of degree, and an issue on which reasonable appellate jurists can disagree (even if there might be disagreement over whether I fall within that category of jurists). Because the claim is unpreserved, it is, of course, not possible to ascertain precisely either the effect of the court's questions on the jury, or the court's purpose in asking them. I cannot and do not ascribe to the trial court any partisan intent on this record. Nonetheless, I believe the possibility of harm was grave here, and I am convinced that, viewed objectively, the court's questions discredited the defendant's expert witnesses and could have been viewed by the jury as an expression of the court's approval of the state's position on issues "key to the outcome of the jury's verdict," as the majority describes them. Part I of the majority

State *v.* Mebane

opinion; see *State* v. *Smith*, 200 Conn. 544, 549, 512 A.2d 884 (1986) (trial court "should never assume a position of advocacy, real or apparent, in a case before it, and should avoid any displays of hostility or skepticism toward the defendant's case, or of approbation for the prosecution's [case]").

I do not draw much guidance from federal case law that the majority cites or that I have reviewed. See, e.g., *Daye* v. *Attorney General*, 712 F.2d 1566, 1570 (2d Cir. 1983), cert. denied, 464 U.S. 1048, 104 S. Ct. 723, 79 L. Ed. 2d 184 (1984). It is possible that federal courts tolerate significant intrusions by district courts in the form of questioning witnesses before they will conclude that the questioning deprives a defendant of a federal constitutional right. But I believe that the majority will agree that, because the defendant's trial took place in *our* courts, we are equally responsible for determining—in fact, principally responsible and perfectly well-equipped to determine—whether the defendant received a fair trial under the due process clause of the federal constitution. See *Pompey* v. *Broward County*, 95 F.3d 1543, 1550 (11th Cir. 1996) ("state courts are courts of equal dignity with all of the federal 'inferior courts'— to use the [f]ramers' phrase—and state courts have the same duty to interpret and apply the United States [c]onstitution as [federal courts] do").

I agree with the majority that "it is proper for a trial court to question a witness in endeavoring, *without harm to the parties*, to bring the facts out more clearly and to *ascertain the truth* . . . ." (Emphasis added; internal quotation marks omitted.) Part I of the majority opinion, quoting *State* v. *Fernandez*, supra, 198 Conn. 13. A trial judge who considers it his job to examine witnesses as part of the judiciary's truth-seeking function risks unduly influencing the jury, however, particularly when he believes that one of the parties came up short with their questions. This is because "[t]he

State *v.* Mebane

influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling." (Internal quotation marks omitted.) *Quercia* v. *United States*, 289 U.S. 466, 470, 53 S. Ct. 698, 77 L. Ed. 1321 (1933). We have held that, when "[t]he outcome of the trial depended largely on the jury's assessments of the respective credibility of [the state's witness] and the defendant," a new trial was warranted when the court questioned the state's witness "in a manner that tended to enhance the [witness'] credibility in the jury's eyes." *State* v. *Smith*, supra, 200 Conn. 550–51.

The majority notes that "[t]he defendant's trial spanned several days and involved the testimony of twenty-four witnesses." In juxtaposition, the majority points out that "the defendant's constitutional challenge is limited to the trial court's brief questioning of three witnesses, one of whom testified on behalf of the state." I focus on only two of the witnesses: the defendant's experts, Kammrath and Kitman.[1] I do not believe that the number of witnesses called during the trial or the number of questions the defendant challenges is an accurate measure of the impact that the trial court's active questioning had on the fairness of the defendant's trial. Brief questioning can be very effective, even devastating, especially coming from the trial judge. Moreover, whether intentional or not, the trial court managed to have the last word as to the main two witnesses the defendant called in his own defense.

---

[1] I do not believe that the trial court's questions of Detective Martin Heanue, which the majority admits were "unnecessary," impacted significantly enough on the fairness of the defendant's trial to warrant discussion in this opinion. I do not agree, however, with any implication, if intended by the majority, that the fact that Heanue testified on behalf of the state meant that the trial court's questions of Heanue somehow counterbalanced the court's questions to the defendant's experts. The court's questions of Heanue appear to emphasize precautions the police took with the photographic array, even though the state had already covered the rationale for the double-blind identification procedure in its direct examination.

State *v.* Mebane

Nor, in my view, were the trial court's questions confined to clarifying for the jury or elucidating the court's own understanding of the witnesses' testimony. See *State* v. *Smith*, supra, 200 Conn. 549–50. Instead, I read the trial court's questions as susceptible to being interpreted by the jury as supporting the state's case and expressing skepticism of the defendant's expert witnesses, whose credibility was key to the jury's acceptance of their conclusions. For these reasons, I cannot conclude that the defendant received a fair trial.[2]

I

After the state rested, defense counsel called Kammrath, an expert in forensic science, to rebut the state's evidence regarding gunshot residue in the defendant's car. The state had presented evidence from eyewitnesses to the victim's shooting that the car's occupant and the victim were engaging in a struggle in the car, during which the occupant shot the victim. Previously, the state had presented testimony from two experts, Alison Gingell and Amy Duhaime, that laboratory testing revealed elements of gunshot residue in the defendant's car, supporting the state's theory that the victim had been shot while in the defendant's car. Gingell's and Duhaime's testimony was far from incontrovertible, however. First, the state's initial tests of three collected samples came back negative for gunshot residue. The state had Duhaime explain that retesting of the samples was undertaken because the machine initially used failed a monthly performance check. Only upon retesting, more than one year later, did the laboratory report

_____

[2] I acknowledge that my review of the evidentiary record leaves me with the impression that the state's case had significant strength, although it was far from airtight. Nonetheless, I do not believe—and do not believe that the majority contends—that the strength of the state's case, even if it were overwhelming, will always defeat a claim of an unfair trial. See, e.g., *State* v. *Williams*, 204 Conn. 523, 540–41, 529 A.2d 653 (1987).

State *v.* Mebane

the presence of antimony, barium, and lead, elements associated with gunshot residue.

These findings were still arguably uncertain, however, as became evident when Gingell and Duhaime testified about information not included in the second laboratory reports to explain what the results indicated. To start, two of the three samples tested contained particles possessing only two of the three elements—antimony and barium—present in gunshot residue. Although these elements may be considered "consistent with" gunshot residue, the existence of those elements in a single particle is insufficient to determine that gunshot residue was in fact present. Lead is the third element, and it was not contained in these two samples. The third sample tested contained a particle containing all three elements, but even then, the most the state's experts could conclude is that this particle is "characteristic of" gunshot residue. As Gingell herself testified, it can be said that a sample contains gunshot reside only if antimony, barium, and lead are "found in one particle and . . . *they form a sphere, a perfect sphere* . . . ." (Emphasis added.)

When defense counsel called Kammrath, she emphasized that it would be inaccurate to categorize the samples as gunshot residue when (1) antimony, barium, and lead were not all present, and (2) the state had failed to identify the specific morphology of the particles. Kammrath's expert opinion was necessarily limited to her review of the lab reports admitted through Gingell's testimony because, as the jury soon learned, Kammrath had not heard and was not responding to the trial testimony of Gingell or Duhaime because she was not present for that testimony the day before. In particular, Kammrath had not heard Gingell testify that antimony, barium, and lead only constitute gunshot residue if the elements form "a perfect sphere . . . ." During cross-examination of Kammrath, the state sought to establish

State *v.* Mebane

that she did not "look at the evidence in this case" and that the lab reports did not include "all of the technical backup as to how they reached these results." Kammrath readily admitted both points. "So," the prosecutor asked, "in terms of the morphology of the spherical nature of the gunshot residue contained in [sample] three, could it have been contained in that pack of materials, and that's why they concluded it was indicative of gunshot residue?" Kammrath responded: "It's possible, but it should have been in the report."

After the state's cross-examination and defense counsel's redirect examination, the following colloquy took place between Kammrath and the trial court:

"The Court: . . . Miss, are you familiar with Alison Gingell . . . ?

"[Kammrath]: Alison who?

"The Court: Alison Gingell.

"[Kammrath]: No, I'm not.

"The Court: What about Amy Duhaime?

"[Kammrath]: Yes.

"The Court: Alright. You're familiar with her. And were you present when either of them testified?

"[Kammrath]: No, I wasn't.

"The Court: Alright. So, you . . . don't know what their representations were about [the samples recovered from the defendant's Maxima]? Correct?

"[Kammrath]: Correct. I don't know."

So as not to leave this colloquy with the court as the last the jury heard from his expert, defense counsel sought to ask a follow-up question about the definition of gunshot residue propounded by the American Society for Testing and Materials. But the trial court, unprompted

State *v.* Mebane

by any objection, shut down any further questioning, stating, "I think you're going beyond the scope here, counsel. I asked about two witnesses . . . ." Defense counsel responded: "I understand, but we repeatedly referred to this as gunshot residue, so I believe that's a mischaracterization." The trial court replied that "[i]t'll be the jury's recollection as to what those witnesses said about the findings of the analyses."

The majority does not attempt to defend the court's inquiries of Kammrath and admits that the questions "could have been perceived [by the jury] to suggest, at least vaguely and by implication, that Kammrath was unaware of the opinions offered [in court] by [the state's] witnesses or that the judge believed that the testimony of [those] . . . witnesses contained information that Kammrath may have overlooked." In my view, this implication was unmistakable. The issue of morphology was not addressed in the lab reports. This was among Kammrath's main criticisms of them: without knowing the morphology of the particle, it cannot be categorized as gunshot residue. Gingell had testified that, for a particle containing antimony, barium, and lead to constitute gunshot residue, it must "form . . . a perfect sphere," but she did not go so far as to testify that the single, three element particle found in one of the samples actually formed a perfect sphere. After Kammrath had criticized the state's lab report for not addressing morphology, however, the state sought to rehabilitate its gunshot residue evidence by suggesting that "the morphology of the spherical nature of the gunshot residue" might have been reflected in the "technical backup" material but left out of the report, "and that's why . . . [the state lab] concluded it was indicative of gunshot residue." Kammrath protested: "It's possible, but it should have been in the report." By making clear to the jury that Kammrath was not present when Gingell or Duhaime testified, and that she therefore did

State *v.* Mebane

not know what their representations were *in court*—
something the state had not even asked about pre-
cisely—the trial court risked being seen as reminding
the jury that the state's witnesses had discussed mor-
phology, and also as associating itself with the state's
line of questioning by suggesting that Kammrath did
not know whether the state's experts had already con-
sidered morphology in reaching their conclusions. I
believe that, viewed objectively, these questions, com-
bined with the court's questions to Kitman, the defen-
dant's final expert witness, deprived the defendant of
a fair trial.

II

Identification of the car in the video surveillance foot-
age that captured the events surrounding the victim's
murder was another hotly contested issue at trial. With
Kitman,[3] the defendant's last expert witness, defense
counsel sought to poke holes in the testimony of the
state's witnesses who claimed that the video depicted
a 2011 Nissan Maxima, the same make and model of
the car owned by Frank Bridgeforth, the defendant's
foster father, and driven regularly by the defendant.

Kitman testified that, after examining Bridgeforth's
Maxima and watching the video footage, it was his
expert opinion that the vehicle in the video was not a
Maxima but was most likely a Chevrolet Impala. This
opinion was consistent with the recollections of Javon
Gaymon, an eyewitness to the murder. Although Gay-
mon testified at trial that the defendant's car looked
like the car he saw on the night of the murder, he
also admitted that he had told the police several times

[3] Kitman was an automative journalist who had written exclusively about
automobiles for more than thirty years in publications including The New
York Times, The Washington Post, and the Los Angeles Times. In addition,
Kitman is president of a company that supplies cars to movies and television
programs, a member of the Society of Automative Historians, and has served
as a judge in car shows.

State *v.* Mebane

around the time of the murder that the car had a brand emblem with a silver deer, which was consistent with an Impala, not a Maxima, and that he told the police that the car had tinted windows. He also testified that the police suggested to him that he was wrong about the brand of the car.

Most pertinent to the trial court's questioning, Kitman explained that Bridgeforth's Maxima had very little or no tint on the windows, whereas the car in the video had heavily tinted windows. Kitman reached this conclusion because it was possible to see light emanating from within and outside of other cars in the video, but the black car that the victim had entered was "completely blacked-out. And that is different than what you would have gotten with [Bridgeforth's Maxima]."

On cross-examination, the prosecutor asked Kitman, "other than blacked out tinting, there's other things that may obscure somebody [from] seeing inside a car, correct?" Kitman responded that, certainly, if the windows were "covered," "like, if you had a curtain up in the car or something," it "wouldn't be [possible] to see inside . . . or outside" the car. Kitman also conceded that it is possible to disable the interior lights to prevent them from illuminating when car doors are opened. After the prosecutor and defense counsel had exhausted their questions for Kitman, the trial court inquired of him:

"[The Court]: . . . So, 2011 is the model year of the Maxima that you examined?

"[Kitman]: I believe, yes.

"[The Court]: Alright. And do you know if that year model had a device in the car that would allow you to dim the dashboard lights?

"[Kitman]: I don't specifically, but I assume that you could dim them.

350 Conn. 483        NOVEMBER, 2024        523

State *v.* Mebane

"[The Court]: That's a pretty—that's been around for a long time, right?

"[Kitman]: Mm-hmm.

"[The Court]: You can make the dashboard brighter?

"[Kitman]: You can—most cars you can. I mean, for the last seventy-five years, I think you could dim the lights.

"[The Court]: And do you know if the 2011 Maxima had a pull up sunshade in the back door window?

"[Kitman]: I don't believe so."

With that, Kitman's testimony, along with all evidence in the trial, ended.

Viewed objectively, the import of the trial court's questions in this context was, in my view, unmistakable. The state's cross-examination had sought to make clear to the jury that the occupant of the car might have covered the window or disabled the interior lights to prevent illumination from escaping. Once again, the trial court expounded on the state's questions, suggesting to the jury that there might be other explanations for light failing to escape from the Maxima: dimming the dashboard lights or putting up a sunshade.[4]

Generously, the majority describes the court's extra questioning as "not exhibit[ing] the restraint or caution that the circumstances demanded . . . ." The majority does not seek to justify why the "embodiment" of court-

_____

[4] In my view, it does not matter that Kitman's answer to the trial court's question about the sunshade was that he did not believe that the 2011 Maxima "had a pull up sunshade in the back door window . . . ." By asking its additional questions, the trial court risked appearing to jurors to have associated itself approvingly with the state's immediately preceding suggestion that there were other ways, besides tinting, in which it "wouldn't be [possible] to see inside . . . or outside" the car. Reasonable jurors likely know a vehicle owner could purchase and install a sunshade, even if it was not standard equipment.

State *v.* Mebane

room neutrality would ask such questions[5] but merely suggests that "the jury was well aware that there were various reasons why the interior of the car depicted in the video surveillance footage may have appeared dark other than the presence of a heavy tint on the windows." The harm to the defendant, however, in my view, came not simply from the jury's hearing other explanations as to why that light might not escape from the car's interior, but from the very real prospect that the jury would view the trial court as associating itself with the state's cross-examination. Our case law cautions against a trial court's exhibiting "skepticism toward the defendant's case, or of approbation for the prosecution's [case]." *State* v. *Smith*, supra, 200 Conn. 549. If Kitman was right in his expert opinion that the car he saw in the video was not a Maxima, then it was highly unlikely that the state's witnesses were right that they saw the defendant at the scene. By continuing the state's line of questioning, the court risked being seen by the jury as essentially expressing approval of the state's cross-examination, and simultaneously exhibiting skepticism toward the opinion of Kitman, whose credibility was "key to the outcome of the jury's verdict . . . ." Part I of the majority opinion. As such, I cannot conclude that the trial court safeguarded the defendant's right to a fair trial.[6]

---

[5] I do not agree with the state that the court "properly intervened to clarify factual matters that had been raised by the state's direct examination—i.e., whether it was possible to obscure the view of a car's interior either by covering the windows or by dimming a car's dashboard lights." On the contrary, I believe that, by this line of questioning, the trial court, even if well-intentioned, could have been seen as "assum[ing] a position of advocacy" by raising alternative explanations that the state had failed to explore. *State* v. *Smith*, supra, 200 Conn. 549.

[6] I agree with the majority that, "if the trial court exercises its discretion to question a witness, the court should instruct the jury . . . that the court's questions to witnesses should not be taken by the jury as an indication of its opinion as to how the jury should resolve any issues of fact." The Judicial Branch's model criminal jury instructions have contained such a general cautionary instruction for nearly one decade, including a specific admonition to the jury not to be "influenced by" the trial judge's own questions to

Accordingly, I respectfully dissent as to part I of the majority opinion.

————————————————